Hugh COLLINS, et al., Plaintiffs

v.

INTERNATIONAL DAIRY QUEEN, INC. and American Dairy Queen Corporation, Defendants.

5:94-cv-95-4 (WDO).

United States District Court, M.D. Georgia, Macon Division.

Jan. 8, 1997.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, GA, Diane Green Smith, Lee Abrams, Chicago, IL, for

Hugh Collins, Max Collins, Matt Mullis, Dairy Queen of Powder Springs, Inc., T-Jazier, Inc.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, GA, Diane Green Smith, Chicago, IL, for Dairy Queen and Brazier of Eastman, Inc.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Macon, GA, William L. Killion, Quentin R. Wittrock, Minneapolis, MN, for defendants.

### ORDER

OWENS, District Judge.

By order entered November 20, 1996, the Court redefined the classes to be certified in this case. Subclass III, defined in the original order of August 30, 1996, as all members of Class I and Class II who operate under franchise agreements containing arbitration provisions, was eliminated. There was also excluded from Class II all those franchisees whose individual franchise agreements provide for arbitration. Following the issuance of the November 20 order defendants raised objections to the lack of language specifically excluding from Class I, consisting of all members of the Dairy Queen Operators' Association ("DQOA"), all those franchisees whose individual franchise agreements provide for arbitration. Additional controversies have also arisen between the parties as to the mandatory or permissive characterization of the various types of arbitration clauses contained in the franchise agreements, as to whether members of Subclass I (members of the permanent settlement class in the *Poole* Settlement Agreement and all persons claiming under them) are required to arbitrate, and as to whether subfranchisees whose operating agreements were entered into with Territory Operators are likewise required to arbitrate.

A meeting was held in chambers on December 6, 1996. At that meeting the court introduced the desirability of eliminating Class I in its entirety, inasmuch as it does not appear that the DQOA members have legal claims or seek damages substantially different from Dairy Queen franchisees who are not members of DQOA. In addition to

the questions whether the *Poole* subclass and subfranchisees of Territory Operators should be compelled to arbitrate their claims against defendants, the parties also discussed whether IDQ is entitled to rely on mandatory arbitration clauses contained in franchise agreements to which only ADQ was a party. Oral arguments on these matters were scheduled and a hearing was held December 19, 1996. Having carefully considered all the arguments presented in the hearing, as well as in the letters, memoranda, and pleadings submitted by the parties, the court has redefined the certified classes as set out in this order. The parties should be mindful, however, that this case is still at the notice stage. Consequently, this order shall be without prejudice to the right of defendants to move, after notice has been sent to potential class members and claims have been made, for appropriate stays pending arbitration.

■ Plaintiffs continue to take the position that all Dairy Queen franchisees may properly receive notification of this class action lawsuit whether or not their franchise agreements contain arbitration clauses. Under plaintiffs' preferred method of class notification defendants would retain the right to compel arbitration as to those franchisees with binding arbitration clauses who do not exercise their right to opt out of the class action. The November 20 order contemplated that such franchisees would not be notified of the pendency of the class action, based on compelling authority submitted by defendants which holds that the Federal Arbitration Act ("FAA") requires a district court to stay judicial proceedings on any issue subject to arbitration under a written agreement once it is determined that the dispute falls with the scope of the arbitration agreement. *See, e.g., Midwest Mechanical Contractors, Inc. v. Commonwealth Constr. Co.,* 801 F.2d 748, 751 (5th Cir.1986).

■ The Court was concerned initially that arbitration had not yet been made an issue in this case and was therefore not before the court. However, defendants have repeatedly emphasized their intention to rely upon the arbitration clauses and to submit any relevant disputes to arbitration. Parties to an arbitration agreement are not required to make a demand for arbitration as a prerequisite to a district court's granting a stay as to arbitrable issues. Imposing such a duty upon defendants could in effect require them to establish their own liability, when the claims subject to arbitration might otherwise never be brought. *See The Anaconda v. American Sugar Refining Co.,* 322 U.S. 42, 45, 64 S.Ct. 863, 865, 88 L.Ed. 1117 (1944); *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.,* 427 F.2d 924, 928 (5th Cir.1970). Those Dairy Queen franchisees and subfranchisees who are bound by mandatory arbitration clauses are not entitled to litigate relevant claims against the defendants in court and should not receive notification of this class action. However, the same conclusion cannot be reached with respect to those whose franchise agreements contain arbitration clauses which are merely permissive or which contain an opt-out provision. The existence of an opt-out provision in such arbitration clauses negates by necessity the requirement of a mandatory stay pending arbitration. Thus, franchisees subject to permissive arbitration clauses should receive notice of the instant class action and be permitted to determine whether to opt out of the class action, to submit to arbitration any dispute they may have with defendants, or to forego arbitration altogether by joining in the class action.

■ The issue has also been raised whether IDQ may rely upon mandatory arbitration clauses contained in franchise agreements entered into with ADQ. The fourth amended complaint and the various pleadings and briefs submitted by plaintiffs do not attempt to differentiate their claims against defendants based upon a distinction between the corporate functions of IDQ and ADQ. Moreover, defendants have never taken the position that as parent corporation IDQ is not responsible for actions taken by ADQ. "When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315 (4th Cir.1988),

quoted in *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993). As this litigation has progressed, the distinction between the functions engaged in by IDQ and by ADQ has become increasingly clear. However, the claims against the two entities are based on essentially the same facts and are in the court's view inherently inseparable. As the parent corporation IDQ is therefore entitled to rely upon the mandatory arbitration clauses in the franchise agreements in which only ADQ is a signatory.

■ Defendants assert that the holding of *Sunkist* as well as those of *McBro Planning & Development Company v. Triangle Electrical Construction Company*, 741 F.2d 342 (11th Cir.1984), and *Sam Reisfeld & Son Import Company v. S.A. Eteco*, 530 F.2d 679 (5th Cir.1976), also support defendants' entitlement to invoke the mandatory arbitration clauses contained in subfranchise agreements in effect between Territory Operators and franchisees, to which neither ADQ nor IDQ are parties. According to the September 21, 1995, affidavit of Michael P. Sullivan, President and Chief Executive Officer of both ADQ and IDQ since 1987, the Territory Operators system, which preceded the formation of American Dairy Queen Corporation, began during 1945 when territorial franchise rights in the Dairy Queen system were granted in specific geographic areas. The Territory Operators were given the right to use the company's trademarks and to license others to use them in the operation of their stores. According to Mr. Sullivan, Territory Operators which still exist within the system sell subfranchises directly to their subfranchisees. ADQ does not sell and is not a party to the subfranchise agreements issued by the Territory Operators to their subfranchisees.

After the meeting on December 6, 1996, defendants' counsel furnished to the court and opposing counsel copies of the various forms of subfranchise agreements between the Territory Operators and the subfranchisees. Each of the agreements, which provide the subfranchisees the license to use the Dairy Queen trademarks while imposing corresponding obligations upon them, is signed by a Territory Operators and the subfranchisee and approved by ADQ. The arbitration provisions contained in the subfranchise agreements make no mention of disputes which may arise between the licensee and ADQ or IDQ but provide for arbitration only between the parties to the agreement. Persuasive authority submitted by plaintiffs supports the conclusion that a district court is not required to compel arbitration between parties who have not agreed to such arbitration. In *Morewitz v. West of England*, 62 F.3d 1356, 1365 (11th Cir.1995), the Eleventh Circuit cited with approval authority which held that a third-party beneficiary of a contract was not a party to the contract based on limiting language of the arbitration clause applying to a dispute between a "member" and the "association." *Morewitz*, 62 F.3d at 1364. The Court of Appeals also cited *In re Talbott Big Foot, Inc.*, 887 F.2d 611 (5th Cir.1989), wherein the Fifth Circuit held that "despite a strong federal policy favoring arbitration, the Act does not require arbitration unless the parties to a dispute have agreed to refer it to arbitration," and that "[w]e are unaware of any federal policy that favors arbitration for parties who have not contractually bound themselves to arbitrate their disputes." *Id.*

The holding of *Sunkist* does not require a contrary conclusion. As plaintiffs point out, the *Sunkist* court emphasized that upon acquiring Sunkist Soft Drinks, Inc., ("SSD") from Sunkist Growers, Inc., the Del Monte Corporation absorbed SSD's operations into Del Monte's own soft drink division and effectively succeeded to SSD's express contractual right to arbitrate any disputes against it. Because defendants have not shown at this point that they have succeeded to the interests of any of the Territory Operators who entered into subfranchise agreements, defendants as non-parties to the subfranchise agreements with the Territory Operators may not invoke said arbitration clauses to prevent notification to the subfranchisees of their right to participate in the class action.

■ Defendants also assert that members of the *Poole* subclass who operate under franchise agreements containing mandatory arbitration clauses must submit their dis-

putes to arbitration. In the court's judgment, the claims of the *Poole* subclass members arise exclusively from the Settlement Agreement entered by the Tennessee court and relate to said Settlement Agreement rather than to the underlying franchise agreement. *See Knight v. Docu–Fax, Inc.,* 838 F.Supp. 1579 (N.D.Ga.1993).[1] Federal policy favors arbitration over litigation and requires a district court to resolve any doubt about the application of an arbitration clause in favor of arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Nevertheless, this policy "cannot serve to stretch a contract beyond the scope originally intended by the parties." *Seaboard Coast Line Railway Co. v. Trailer Train Co.,* 690 F.2d 1343, 1348 (11th Cir. 1982), citing *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 242, 82 S.Ct. 1318, 1321, 8 L.Ed.2d 462 (1962). The policy favoring arbitration does not compel the court to require arbitration of disputes if arbitration was not the intent of the parties. Because the parties to the *Poole* settlement agreement did not agree to submit disputes for breaches of the agreement to arbitration, such was clearly not their intent. Moreover, inasmuch as the mandatory arbitration clauses in the franchise agreements did not contemplate the future existence of a Settlement Agreement, the arbitration clauses did not cover the situation of a breach of a subsequent Settlement Agreement which did not exist at the time. *Cf. Knight v. Docu–Fax, Inc.,* 838 F.Supp. at 1583 & n. 9.

As a final matter, plaintiffs have expressed concern that the elimination of the DQOA class will have the effect of excluding the claims of those Territory Operators whose claims arise out of their mandatory payments to the Dairy Queen advertising fund. The new Class II defined herein has been created in order to include potential claims of Territory Operators who would not otherwise fit within the existing classes. Accordingly, it is hereby ORDERED as follows:

(1) That the previous Order entered November 20, 1996, is hereby VACATED;

(2) That the Order entered August 30, 1996, granting plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23(b)(3), is hereby MODIFIED to certify the following classes:

(a) Class I, consisting of all Dairy Queen and Dairy Queen/Brazier franchisees in the United States, except those franchisees who are located in the state of Texas and those who are Territory Operators, and except those franchisees whose individual franchise agreements provide for mandatory arbitration of disputes with ADQ and/or IDQ.

(b) A subclass consisting of all members of Class I who made mandatory payments to the Dairy Queen advertising fund.

(c) Class II, consisting of all Dairy Queen and Dairy Queen/Brazier Territory Operators in the United States who either (1) have operated a Dairy Queen store or a Dairy Queen/Brazier store, or (2) have made, or have been obligated to make, payments to the Dairy Queen advertising fund. Excluded from Class II, however, shall be those Territory Operators who are located in the state of Texas, and those Territory Operators whose franchise agreements or operating agreements provide for mandatory arbitration of disputes with IDQ or ADQ.

(d) Class III, consisting of all members of the permanent settlement class in the *Poole* Settlement Agreement, and all persons claiming under them, who may have claims

---

1. The *Knight* court drew a distinction between the terms "arising under" and "arising under *or relating to,*" 838 F.Supp. at 1583, a distinction which was disavowed by the Eleventh Circuit in *Gregory v. Electro–Mechanical Corporation,* 83 F.3d 382, 386 (11th Cir.1996). However, such a distinction between terms is not required in order to find that the claims of the members of the *Poole* settlement class arise from the Settlement Agreement rather than from the franchise agreement. The *Knight* court held that "[p]utting aside the similarity of the subject matter of the two contracts at issue, determining the breach *vel non* of the Settlement Agreement requires the factfinder to construe *only* the Settlement Agreement and the performance (or lack thereof) under that contract." 838 F.Supp. at 1584. Similarly, the factfinder in the present case is not required to consult each franchise agreement in order to determine whether defendants violated the *Poole* Settlement Agreement.

against defendants arising from the Settlement Agreement.