**Hugh COLLINS, et al., Plaintiffs,**

v.

**INTERNATIONAL DAIRY QUEEN, INC.; and American Dairy Queen Corporation, Defendants.**

**No. 5:94–95–4–MAC(WDO).**

United States District Court, M.D. Georgia, Macon Division.

March 23, 1998.

(4th Cir.1994).

See also 990 F.Supp. 1469.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, GA, Diane Green Smith, Lee Abrams, Chicago, IL, for Plaintiffs.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Macon, GA, William L. Killion, Quentin R. Wittrock, Minneapolis, MN, for Defendants.

### ORDER

OWENS, District Judge.

In this class action lawsuit against International Dairy Queen, Inc. ("IDQ") and American Dairy Queen Corporation ("ADQ"), the court has previously ruled that arbitration clauses in Dairy Queen subfranchise agreements should not prevent notification to the subfranchisees of their right to participate in the class action. *See Collins v. International Dairy Queen, Inc.,* 169 F.R.D. 690, 693 (M.D.Ga.1997). Defendants were specifically granted the right in that order to move for appropriate stays pending arbitration after notice had been sent to all potential class members, including Dairy Queen subfranchisees, and claims had been made. *Id.* at 692.

Potential class members having now been notified, defendants have accordingly filed a motion to stay the claims of the subfranchisee class members pending arbitration or, in the alternative, to dismiss the subfranchisee class members' contract and antitrust tying claims. Defendants argue, first, that they are third-party beneficiaries of the subfranchisee agreements who are entitled to invoke the arbitration clauses therein. They also argue that they can enforce the arbitration provisions of the prime franchise contracts between the Dairy Queen Territory Operators and ADQ as to the subfranchisees' contractual claims. Finally, they contend that the antitrust tying claims of the subfranchisees should be dismissed as a matter of law.

Dairy Queen franchises may be obtained by either of two methods. The first method is by entering into a franchise agreement directly with ADQ. The second method is by entering into a franchise agreement with a Dairy Queen Territory Operator. Territory Operators are franchisees of ADQ that are considered to be distinct and separate entities. ADQ has granted the Territory Operators the right to sublicense Dairy Queen stores in their defined areas. Defendants do not sell and are not parties to the subfranchise agreements between the Territory Operators and subfranchisees, although ADQ retains the right to approve any such agreements. There are approximately 360 different versions of subfranchise agreements used

in the Dairy Queen system; an estimated 500 of the subfranchisees have arbitration clauses in their agreements. Defendants claim that they are entitled to the benefits of these arbitration clauses.

■ Federal policy strongly favors arbitration and requires resolution of any doubt about the application of an arbitration clause in favor of arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 479–80, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). When the language in the contract is capable of two constructions, a "healthy regard" for the federal policy of encouraging arbitration demands that "any doubts concerning the scope of the arbitrable issues be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983); *Gregory v. Electro–Mechanical Corp.*, 83 F.3d 382, 385 (11th Cir.1996).

■ Nevertheless, unless the parties agreed to arbitrate their disputes they may not be required to do so. *Threlkeld v. Metallgesellschaft Limited*, 923 F.2d 245, 247 (2d Cir.1991), citing *Necchi S.p.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 696 (2d Cir.1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966). "The first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). Unless the court finds that a party agreed to submit his claim to arbitration, he cannot compel the party to do so. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

■ Arbitration may be compelled when: (1) there is a valid written agreement to arbitrate; (2) the issue is arbitrable under the agreement; and (3) the party asserting the claims has failed or refused to arbitrate the claims. 9 U.S.C. §§ 2–4; *Prima Paint*

*Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Goldberg v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 650 F.Supp. 222, 225 (N.D.Ga.1986). The subfranchisee class members operate under numerous subfranchise agreements containing valid mandatory arbitration clauses. The wording of these arbitration clauses is generally broad as they pertain to arbitrable issues. For example, the arbitration provision in the form 302A subfranchise agreement refers to disputes "arising under, out of, in connection with or in relation to" the agreement. Plaintiffs contend that defendants are not entitled to invoke the arbitration provisions because they were not parties to the subfranchise agreements and the subfranchisees did not agree to arbitration with defendants. The issue before the court is whether, based upon the terms of the agreements themselves as well as the surrounding circumstances, the valid arbitration provisions in the' subfranchise contracts between the Territory Operators and the subfranchisees should extend to claims the subfranchisees may assert against IDQ/ADQ as non-parties to the agreements.

In deciding this issue, the court first notes that the arbitration provisions at issue are not specifically made applicable to disputes which may arise with International Dairy Queen, Inc., or American Dairy Queen Corporation. The arbitration provision in the form 302A subfranchise agreement, which is typical, provides: "*In the event of any dispute between the parties hereto arising under, out of, in connection with or in relation to this Agreement*, said dispute shall be submitted by the parties to binding arbitration in accordance with the Rules and Procedures and under the auspices of the American Arbitration Association" (emphasis added). Some of the subfranchise agreements expressly provide for arbitration of "any dispute between *Territory Operator and Licensee* arising under, out of, in connection with or in relation to this agreement," while other agreements require arbitration "in the event of a breach of threatened breach ... by *Licensee.*"

■ Notwithstanding the limiting language in the various arbitration provisions,

defendants claim the status of third-party beneficiaries of the subfranchise agreements who as such are entitled to compel arbitration. Parties to a contract may create rights in a third-party beneficiary "by manifesting an intention to do so." *Beverly v. Macy,* 702 F.2d 931, 940 (11th Cir.1983). The determination of intent is the crucial element, and third parties may sue on the contract only if the contract was intended for their direct benefit rather than merely their incidental benefit. *Id.; Ross v. Imperial Constr. Co.,* 572 F.2d 518, 520 (5th Cir.1978). RESTATE-MENT (SECOND) OF CONTRACTS § 302 provides:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of a promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

A third-party beneficiary need not be the intended beneficiary at the time the contract was made, nor must the promisee be motivated solely by its desire to bestow a benefit on the third person. *Beverly,* 702 F.2d at 941; *Avco Delta Corp. Canada Ltd. v. United States,* 484 F.2d 692, 702–03 (7th Cir.1973), *cert. denied sub nom. Canadian Parkhill Pipe Stringing, Ltd. v. United States,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Whether the third party was an intended beneficiary may be determined by examining both the writing itself as well as the surrounding circumstances known to the parties. *Beverly,* 702 F.2d at 941.

■ Numerous factors support the third-party beneficiary status of the defendants.

The subfranchise agreements require the subfranchisees to operate their subfranchisees according to specifications of ADQ, which is specifically referred to throughout the agreements.[1] The representative Form 302A franchise agreement requires subfranchisees to use Dairy Queen trademarks and service marks, to use the merchandising, sales promotion programs and business methods and techniques developed and approved by ADQ, and to cooperate in ADQ's sales promotion programs of approved products. The subfranchise agreements require the signature of ADQ to approve the contract between the Territory Operator and the subfranchisees. Moreover, ADQ is given the right to inspect store facilities, approve sales promotion materials, conduct audits of the books and records, and develop design, layout, and accessory plans for the stores. Thus, the writing itself demonstrates that defendants are third-party beneficiaries of the subfranchise agreements and that the subfranchisees by signing the agreements intended to bestow numerous benefits on defendants.

■ Third-party beneficiary status does not in and of itself create the right to enforce an arbitration clause. For example, in *Morewitz v. The West of England Ship Owners Mutual Protection and Indemnity Association,* 62 F.3d 1356 (11th Cir.1995),[2] the Eleventh Circuit approvingly cited authority which held that a third-party beneficiary of a contract was not a party to the contract because the arbitration clause applied specifically to a dispute between a "member" and the "association." *Id.* at 1365. In appropriate circumstances, however, third-party beneficiaries are entitled to enforce the arbitration provisions of a contract. For example, in *Spear, Leeds & Kellogg v. Central Life Assurance Co.,* 85 F.3d 21, 26 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 609, 136 L.Ed.2d 534 (1996), the court held that the insurance companies were third-party benefi-

1. Defendants have informed the court that the form 302A agreement specifically references IDQ/ADQ ninety-five times.

2. Although the *Morewitz* court expressed doubt as to whether the arbitration clause in the policy between West of England applied to claims made

by Morewitz on behalf of deceased crew members because of the limiting language in the arbitration clause, it based its ultimate holding upon its conclusion that West of England had waived any right it may have had to compel arbitration. *Morewitz,* 62 F.3d at 1365.

ciaries of Leeds' agreement to follow the arbitration rules of the New York Stock Exchange. One of such rules provided that "any controversy between a member .. and any other person arising out of the business of such member ... shall at instance of any such party be submitted for arbitration." Based on this provision, the insurance companies were entitled to compel arbitration. Similar fact situations existed in *Patten Securities Corp. v. Diamond Greyhound and Genetics, Inc.,* 819 F.2d 400 (3d Cir.1987), and *Scobee Combs Funeral Home, Inc. v. E.F. Hutton & Co.,* 711 F.Supp. 605 (S.D.Fla.1989). In each of these cases the non-signatory was held to be entitled to compel arbitration because the opposing party had agreed to arbitrate controversies between itself and any of its customers at the customers' request. In *Letizia v. Prudential Bache Securities, Inc.,* 802 F.2d 1185 (9th Cir.1986), plaintiff Letizia opened a securities account with Prudential Bache and signed a standard Customer Agreement containing an arbitration clause. He filed a lawsuit claiming that his account executive and the account executive's supervisor had churned his account, causing him to sustain monetary losses. Noting that because of the strong federal policy favoring arbitration, "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles," *id.* at 1187–88, the court found that the individual brokerage firm employees were bound by the arbitration agreement and that Prudential Bache had indicated through its Customer Agreement its intention to protect its employees. *Id.* at 1188.

In *Ziegler v. Whale Securities,* 786 F.Supp. 739 (N.D.Ind.1992), plaintiff Ziegler opened a margin and cash account with Whale, a broker, who contracted with Cowen & Co., the "clearing broker," for processing and transaction services. Ziegler signed a margin agreement with Cowen which contained an arbitration clause which provided that "The terms and conditions of this agreement, including the arbitration provision, shall be applicable to all matters between such other broker-dealer and me." The court held that Whale was entitled to compel arbitration because the term "broker-dealer" included both

Brody and Whale. *Id.* at 741. In *Nesslage v. York Securities, Inc.,* 823 F.2d 231 (8th Cir.1987), plaintiff entered into a margin agreement with Q & R Clearing Corporation which contained an arbitration provision. The court found that because defendant York was the disclosed agent of Q & R, York could compel arbitration of its dispute with plaintiff.

Most of the previously discussed cases relied on by defendants support the general applicability of arbitration clauses to third-party beneficiaries, although most of the cases are factually dissimilar to the case sub judice and no case is directly on point. More direct support for defendants' position is provided in *International Union of Operating Engineers Local 926,* 640 F.Supp. 66 (N.D.Ga.1986). There, the local union of International Union of Operating Engineers sought damages for breach of a contract between the international union and defendant. Defendant argued that since plaintiff was not a signatory to the agreement, plaintiff could not seek enforcement of the arbitration provisions of the agreement. *Id.* The district court held, using general principles of contract law, that the local union was a third-party beneficiary of the contract between the international union and the defendant inasmuch as the international union intended the local union to benefit from the contract. In reaching this conclusion the court found that the local union was the intended beneficiary of at least two articles of the contract, which required the international union and the employer to notify the local union concerning certain actions taken by the employer and required the employer to follow the local union's procedures when operating within the local union's jurisdiction. *Id.* at 67. That being the case, the court concluded that the local union would also be permitted to take advantage of the arbitration clause of the contract, which provided that "all grievances within the scope of this Agreement ... that may arise on any job covered by this Agreement, shall be handled through the grievance and arbitration procedures of the local union agreement involved." *Id.* at 67–68.

■ Based on the principles of contract law as well as the authority of applicable

caselaw, it is this court's conclusion that defendants are not entitled to compel arbitration in the cases of those subfranchisees whose arbitration clauses specifically refer to arbitration between "Territory Operator and Licensee" or whose agreements specifically state that the arbitration clause is applicable "in the event of a breach of threatened breach ... by *Licensee*." This language indicates clearly and unambiguously that the subfranchisees did not intend for the arbitration provisions to apply to defendants, third-party beneficiary status notwithstanding.

A more difficult issue to be resolved is whether the language "between the parties hereto" is sufficiently explicit and unambiguous to indicate that the subfranchisees did not intend to include IDQ/ADQ within the arbitration provisions. The "between the parties" language is admittedly susceptible to two interpretations; however, defendants' position is bolstered by the fact that the subfranchise agreements clearly bestowed numerous benefits on defendants and specifically referenced ADQ numerous times within the body of the agreements. This general language "between the parties" lacks the certainty of the more precise language indicating by name the intended beneficiaries and/or the party entitled to invoke arbitration. It is true, as plaintiffs argue, that the reference to "parties" is to the Territory Operator and the subfranchisee inasmuch as they were the only parties to the agreements. Nevertheless, keeping in mind the benefits conferred upon defendants by the subfranchise agreements and the repeated references to ADQ throughout the body of the agreements, the court cannot hold that the agreement to arbitrate disputes "between the parties hereto" has the necessary precision and unambiguity to clearly indicate that the Territory Operators and the subfranchisees did not intend for ADQ to benefit from it. The language used in the arbitration provision fails to demonstrate clearly and unambiguously a specific intention by the subfranchisees that the benefits of arbitration "arising under, out of, in connection with or in relation to" the subfranchise agreement

was limited to disputes with the Territory Operators. Consequently, in light of the federal policy favoring arbitration, the court holds that defendants are entitled to invoke the mandatory arbitration clauses in those subfranchise agreements which make reference to disputes "between the parties hereto" without any additional limiting language.

Defendants further argue that even if IDQ/ADQ are not held to be third-party beneficiaries of the subfranchise agreements, they are entitled to enforce the arbitration provisions of the prime franchise agreements between IDQ/ADQ and the Territory Operators with respect to the subfranchisees' contractual claims. Defendants argue that the subfranchisees are equitably estopped from granting them the benefits of such arbitration clauses insofar as the subfranchisees' claims derive from their assumption of rights as third-party beneficiaries of the prime franchise agreements.[3]

In Count IV of the fourth amended complaint plaintiffs assert breach of contract claims relating to defendants' obligations under the franchise agreements to approve products for use in Dairy Queen franchise stores. In Count VI of the fourth amended complaint they allege breach of contract with respect to defendants' management of the advertising fund to which many of the franchisees are required to contribute under their franchise agreements. To the extent that the subfranchisees' claims under Count IV and Count VI derive not from their subfranchise agreements with the Territory Operators but rather from the prime franchise agreements between IDQ/ADQ and the Territory Operators, the subfranchisees are assuming the benefits of the prime franchise agreements as third-party beneficiaries. A third-party beneficiary is bound by all the terms and conditions of the contract it invokes, and cannot accept the benefits of the contract while at the same time avoiding its limitations. *Consolidated Bathurst, Ltd. v. Rederiaktiebolaget Gustaf Erikson*, 645 F.Supp. 884, 887 (S.D.Fla.1986); *Interpool Limited v. Through Transport Mutual Insurance Association Ltd.*, 635 F.Supp. 1503,

3. Plaintiffs state that of the 128 different contracts between ADQ and the Territory Operators

that defendants have produced in discovery, only 23 contain arbitration provisions.

1986 A.M.C. 1150 (S.D.Fla.1985); *Trans–Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370 (D.C.Cir.1976). Thus, those subfranchisees who signed agreements with Territory Operators whose primary franchise agreements with IDQ/ADQ contained mandatory arbitration clauses are bound by those arbitration clauses insofar as the contractual claims set forth in Count IV and Count VI of the fourth amended complaint are concerned.

 In the court's previous ruling on the applicability of the arbitration provisions defendants argued that the subfranchisees should not receive notification of the class action based on the theory of equitable estoppel as set forth in *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753 (11th Cir.1993), and *McBro Planning & Development Company v. Triangle Electrical Construction Company,* 741 F.2d 342 (11th Cir. 1984). We held that "[b]ecause defendants have not shown at this point that they have succeeded to the interest of any of the Territory Operators …, defendants as non-parties to the subfranchise agreements … may not invoke [the] arbitration clauses to prevent notification to the subfranchisees of their right to participate in the class action." *Collins,* 169 F.R.D. at 693. Our intention to limit that holding to the issue of notification of potential class members is demonstrated by the fact that defendants were given the right to file appropriate motions for stay at a later date and after notification. Nevertheless, to the extent that the conclusions reached in the present order as to defendants' right to invoke the various arbitration clauses may be read as conflicting with the conclusions reached in the earlier order, that order is hereby overruled.

 Finally, defendants argue that the subfranchisees' antitrust tying claims should be dismissed as a matter of law. According to defendants, because IDQ/ADQ did not sell the subfranchisees their franchises, they could not have "tied" any other product to the franchise. As this court discussed in its order denying defendants' motion for sum-mary judgment on plaintiffs' tying claims, *see Collins v. International Dairy Queen, Inc.,* 939 F.Supp. 875 (M.D.Ga.1996), a tying arrangement is an agreement by one party to sell a product (the "tying product") with the condition that the buyer also purchase a different product (the "tied product"). *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Supreme Court has characterized the essential wrong of a tying arrangement as a seller's misuse of his control over the tying product to force the buyer to purchase products that the buyer "either did not want at all, or would have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

 No authority has been cited to directly support defendants' assertion that a tying arrangement cannot exist between a franchisor and its subfranchisees as a result of the franchisor's not being a party to the subcontract agreement.[4] Several factors lead to the conclusion that such a tying relationship could be found to exist in the present case. First, the court has already determined that defendants are third-party beneficiaries of the subfranchise agreements. As defendants themselves have insisted, the subfranchise agreements grant them numerous benefits, including the right of inspection and approval of stores and promotion materials and the right to audit books and records. Second, no party has claimed that the subfranchisees are exempt from any of the requirements imposed by defendants on the franchisees which plaintiffs contend constitute a tying arrangement, and defendants do not assert that they lack the right to enforce the provisions of the subfranchise agreements that require the subfranchisees to use only approved supplies and ingredients. Finally, defendants' right to approve or withhold approval of the subfranchise agreements and the renewal of those agreements could be construed as the possession of sufficient authority over the

---

4. The court notes that in *Casey v. Diet Center, Inc.,* 590 F.Supp. 1561 (N.D.Cal.1984), the plaintiffs were third-tier subfranchisees of defendant. In reaching its ultimate conclusion that there was no illegal tying arrangement, the district court apparently assumed that such allegations brought by a subfranchisee were not improper. *Id.* at 1567.

alleged tying product to enable them to exercise coercion with respect to the alleged tied products. The court concludes, therefore, that the subfranchisees are entitled to pursue their tying claims against the defendants.

In conclusion, for the reasons stated hereinabove, it is ordered:

(1) That defendants' motion to dismiss the subfranchisees' antitrust tying claims is **DENIED**;

(2) That defendants' motion to stay the subfranchisee class members' claims is **DENIED** as to those subfranchisees operating under subfranchise agreements with arbitration provisions expressly providing for arbitration of "any dispute between Territory Operator and Licensee arising under, out of, in connection with or in relation to this agreement," or requiring arbitration "in the event of a breach of threatened breach … by *Licensee.*"

(3) That defendants' motion to stay subfranchisee class members' claims pending arbitration is **GRANTED** as to those subfranchisees operating under subfranchise agreements containing mandatory arbitration provisions which generally provide: "In the event of any dispute between the parties hereto arising under, out of, in connection with or in relation to this Agreement, said dispute shall be submitted by the parties to binding arbitration in accordance with the Rules and Procedures and under the auspices of the American Arbitration Association." Defendants shall proceed to arbitration as to the claims of those subfranchisees.