Jason **HERMAN**, William Cohen, Joey Kratt, and Christina Lancaster, individually and on behalf of those similarly situated, Plaintiffs,

v.

**SEAWORLD PARKS & ENTERTAINMENT, INC., Defendant.**

**Case No: 8:14–cv–3028–MSS–JSS**

United States District Court, M.D. Florida, TAMPA DIVISION.

Filed 03/10/2017

Paul R. Fowkes, Disparti, Fowkes & Hasanbasic PA, Trinity, FL, Ryan Christopher Hasanbasic, Disparti Fowkes & Hasanbasic, P.A, Holiday, FL, James E. Felman, Katherine Earle Yanes, Kynes, Markman & Felman, PA, Tampa, FL, for Plaintiffs.

Ann Elizabeth Prouty, Colin Christopher Deihl, Thomas William Carroll, Faegre Baker Daniels, LLP, Denver, CO, Christopher T. Hill, Hill & Rugh, Keller & Main, PL, Orlando, FL, for Defendant.

## ORDER

MARY S. SCRIVEN, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** comes before the Court for consideration of the Motion for Class Certification (Dkt. 93) filed by Plaintiffs, Jason Herman, William Cohen, Joey Kratt, and Christina Lancaster, the Response in opposition thereto (Dkt. 99) filed by Defendant, SeaWorld Parks and Entertainment, Inc. ("SeaWorld"), and the Supplement (Dkt. 115) filed by Plaintiffs; the Motion to Strike Defendant's Expert Report of Allan Metcalf (Dkt. 91) filed by Plaintiffs, and the Response in opposition thereto (Dkt. 96) filed by SeaWorld; and the Motion to Strike Defendant's Expert Report of Joseph J. Egan (Dkt. 92) filed by Plaintiffs, and the Response in opposition thereto (Dkt. 97) filed by SeaWorld.

Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiffs' Motion to Strike Defendant's Expert Report of Allan Metcalf (Dkt. 91), **DENIES** Plaintiffs' Motion to Strike Defendant's Expert Report of Joseph J. Egan (Dkt. 92), and **GRANTS** Plaintiffs' Motion for Class Certification (Dkt. 93), for the reasons that follow.

### I. PROCEDURAL BACKGROUND

Plaintiff, Jason Herman ("Herman"), filed this putative class action against SeaWorld on December 3, 2014. (Dkt. 1) On January 1, 2015, Herman filed an amended complaint, which added two additional named Plaintiffs, William Cohen and Joey Kratt. (Dkt. 26) On October 15, 2015, with SeaWorld's consent, Plaintiffs filed their Second Amended Com-

plaint, which added Christina Lancaster as an additional named Plaintiff. (Dkt. 72)

Plaintiffs purchased annual passes to theme parks owned by SeaWorld through SeaWorld's "EZ Pay" system, which allows customers to pay for their annual passes over twelve installments. (Id. at ¶¶ 11, 14, 34, 41, 49)

The predominant issue in this case centers on the proper interpretation of an automatic renewal provision in the EZ Pay contract. There is only one provision in the EZ Pay contract that addresses automatic renewal. The provision in its entirety states:

EXCEPT FOR ANY PASSES PAID IN LESS THAN 12 MONTHS, THIS CONTRACT WILL RENEW AUTOMATICALLY ON A MONTH–TO–MONTH BASIS FOLLOWING THE PAYMENT PERIOD until I[1] terminate it.

(Dkt. 93–4, 93–5) This provision is comprised of two components: (1) the automatic renewal language, and (2) the qualification language that precedes the renewal language, which dictates whether automatic renewal will apply: "EXCEPT FOR ANY PASSES PAID IN LESS THAN 12 MONTHS" (hereinafter the "qualification language").

The Parties dispute the proper interpretation of the qualification language, specifically the meaning of "PAID IN LESS THAN 12 MONTHS," and whether SeaWorld was authorized under the contract to auto-renew the EZ Pay passes of the proposed class members. Plaintiffs assert that SeaWorld was not entitled to auto-renew one-year EZ Pay passes as a matter of course because pass holders actually paid off their passes over a duration of eleven (11) months. To illustrate: a typical one-year EZ Pay pass holder who purchases his or her pass on January 1st makes the down payment on January 1st. (Dkt. 93–1 at P. 37:4–10) SeaWorld then automatically charges the customer's credit or debit card for the eleven (11) additional monthly installment payments once each month thereafter. (Id. at P. 34:18–

35:4; 36:15–37:25) Therefore, as to the pass holder who purchased an EZ Pay pass and made the initial down payment on January 1st, the eleventh and final installment payment (twelfth overall payment) is charged on December 1st.

■ Although there was initially a quibble over whether most passes are paid off in "less than twelve months," SeaWorld's counsel and its corporate representative have now both stated that, from a calendar perspective and a grammatical perspective, one-year EZ Pay pass holders pay off their passes over a duration that is less than twelve (12) months in the normal course. (Dkt. 38 at P. 20:1–14[2]; Dkt. 93–3 at P. 25: 2–21)

SeaWorld contends now that its contract is ambiguous and that it was entitled to auto-renew one-year EZ Pay passes as a matter of course because pass holders paid off their passes over twelve (12) countable monthly payments.

Plaintiffs allege that, if the plain meaning of the contract is accepted, SeaWorld breached the terms of the EZ Pay contract by continuing to charge customers monthly installment payments beyond the expiration of the annual EZ Pay passes. (Dkt. 72 at ¶ 73) Plaintiffs also allege that SeaWorld violated the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq. ("EFTA"), with respect to customers who used debit cards to pay for their EZ Pay passes because any transfers initiated by SeaWorld from the customers' bank accounts beyond the first twelve installments were initiated without the authorization of the customers. (Id. at ¶¶ 79–81) Plaintiffs have now moved for class certification under Count I (breach of contract) and Count II (EFTA).

## II. FACTUAL BACKGROUND

SeaWorld operates theme parks located throughout Florida, Texas, California, and

---

1. "I" refers to the customer purchasing the EZ Pay pass.

2. SeaWorld's counsel stated the same during a hearing on SeaWorld's Motion to Dismiss held on March 5, 2015. (Dkt. 32, 37) "Statements made by an attorney during oral argument are binding judicial admissions .... " Jadael, Inc. v. Elliott, No. 6:05–cv–1623–Orl–DAB, 2007 WL 2480387, at *11, n. 12 (M.D. Fla. Aug. 29, 2007).

Virginia.[3] SeaWorld offers customers who wish to purchase one-year passes to any of these parks an option to pay for the passes through the "EZ Pay" system.

Once a customer has made his or her twelfth overall payment on a one-year EZ Pay pass, the customer is deemed to have met his or her initial "commitment" to Sea-World. (See Dkt. 93–2 (stating that "[a]n EZ Pay pass account is considered to be 'in commitment' from the initial purchase, until the guest has paid for the cost of the pass over the agreed upon number of payments")) After the customer has met the initial "commitment," the EZ Pay pass is considered to have "expired." (Dkt. 93–1 at P. 64:18–65:8) However, unless the customer calls Sea-World to affirmatively cancel the EZ Pay account, SeaWorld automatically renews the EZ Pay pass as a matter of course and continues to charge the customer's bank or credit account each month for an amount equal to the monthly installment payment due under the EZ Pay contract. (Id. at P. 64:18–65:8; Dkt. 38 at P. 20:1–5) SeaWorld internally refers to these additional monthly payments as "out of commitment" payments. (Dkt. 93–1 at P. 90:22–91:3)

SeaWorld utilized a standardized form EZ Pay contract for all of its parks from at least December 3, 2008 through December 3, 2013. (Dkt. 93–1 at P. 47:1–23, 132:2–24) The form contract was drafted by SeaWorld and has materially uniform terms and conditions. (Dkt. 93–1 at P. 47:1–23, 132:2–24; Dkt. 93–3 at P. 139:18–140:8) The contract was presented to all customers purchasing a one-year EZ Pay pass during the limitations periods relevant to this action on a "take it or leave it" basis. (Dkt. 93–1 at P. 132:2–24) No customer has the ability to negotiate the contract's terms. (Id.) The EZ Pay contract is the only legally binding contract that EZ Pay purchasers execute. (Id. at P. 121:5–16) At the bottom of the agreement, it states: "I ACCEPT THE TERMS OF THIS AGREE-

MENT. I ACKNOWLEDGE RECEIPT OF THIS DOCUMENT." (Dkt. 93–4, 93–5) Consistent with this language, SeaWorld's corporate representative testified that SeaWorld never intended to "incorporate any other terms outside" of the EZ Pay contract into the agreement. (Dkt. 93–3 at P. 141:18–25)

A customer may purchase an EZ Pay pass to one of SeaWorld's parks in one of three ways: 1) through SeaWorld's website for the particular park; 2) over the phone; or 3) at the gate of the SeaWorld park. Regardless of the manner of purchase, the customer executes the same form EZ Pay contract. (Dkt. 93–1 at P. 132:2–24; Dkt. 93–3 at P. 139:18–140:8) The procedures for purchasing EZ Pay passes remained uniform from December 2008 through December 3, 2013. (Dkt. 93–3 at P. 60:14–66:23)

A customer purchasing an EZ Pay pass on SeaWorld's website for that park is required to view the EZ Pay contract and click a box indicating that he or she accepts the terms of the EZ Pay contract before the purchase is completed. (Id. at P. 60:14–66:23, 60:14–62:16) After the payment information is processed, SeaWorld emails the guest a receipt along with an "E–Voucher," which is a document that the guest must print out and take to the park to receive their pass. (Dkt. 93–10, 93–11, 93–12) SeaWorld's park websites include Frequently Asked Questions ("FAQs"). The FAQ's for all parks at issue in this case state that SeaWorld will automatically renew the EZ Pay pass on a month-to-month basis after the initial term ends. (Dkt. 93–13) The FAQ's do not reference the qualification language. (Id.)

A customer purchasing an EZ Pay pass over the phone is read a "script." According to the script, the SeaWorld representative is supposed to tell the consumer: "Until you terminate the contract, it will renew on a month to month basis following the initial first full plan term," along with other "key points." (Dkt. 93–14) The script does not

---

**3.** These theme parks include: "Busch Gardens," located in Tampa, Florida and Williamsburg, Virginia; "Seaworld," located in Orlando, Florida, San Antonio, Texas, and San Diego, California; "Aquatica," located in Orlando, Florida and San Diego, California; "Adventure Island," located in Tampa, Florida; "Discovery Cove," located in Orlando, Florida; and "Water Country USA," located in Williamsburg, Virginia. SeaWorld also operates a theme park called "Sesame Place" in Pennsylvania; however, that park does not offer one-year EZ Pay passes and therefore is not implicated in this class action. (See Dkt. 93–1 at P. 15:3–20)

reference the qualification language. (Id.) The script is not sent to the customer in writing. If the customer still wants to purchase the pass, the SeaWorld representative, not the customer, clicks an "I accept" box in the SeaWorld system. (Dkt. 93–3 at P. 64:14–65:22) After the SeaWorld representative takes the customer's payment information and email address, the customer is emailed a copy of the EZ Pay contract. (Id. at P. 64:14–65:22) The customer must then click a box indicating that he or she accepts the terms of the EZ Pay contract. (Id. at P. 64:14–66:23) If the customer does not accept the agreement, the EZ Pay pass will not be activated. (Id.) If the customer does accept the agreement, the customer receives an email with the E–Voucher that he or she uses to receive the EZ Pay pass at the park. (Id.)

A customer purchasing an EZ Pay pass at the gate requests a pass from the ticket booth. (Id. at P. 62:17–64:6) Although there is no formal script for gate purchases, SeaWorld's corporate representative testified that its employees are trained to highlight a few "key points" of the EZ Pay pass, including that the pass will auto-renew. (Id.) The employees are not trained to inform the customers about the qualification language. (Id.) If the customer decides to proceed with the purchase of an EZ Pay pass, the entire EZ Pay contract language is printed on a receipt and presented to the customer for signature. (Id.) The customer must sign the receipt and accept the terms of the EZ Pay contract prior to receiving their pass and entering the park. (Id.)

SeaWorld has trained its employees to minimize refunds when customers call to complain that they were charged "out of commitment" payments beyond the initial term of the pass. A document entitled "Things to Remember for EZpay Beyond Commitment Refunds" lays out the following procedures:

- Always pull up the guest's account before quoting any policy.
- Stick to our policy of "no refunds" first; some guests may be OK with that if we explain it nicely.
- If the guest pushes back then review the account for possible exceptions.

- Don't go straight to 3 months; if you think the guest would be happy with 1 or 2 months offer that.
- Be mindful of your tone and word choice, and if you do offer a refund nicely let the guest know that this is an exception to the rule.

(Dkt. 93–16; Dkt. 93–1 at P. 81:7–85:10) The words "3 month MAX" are included on the bottom of the document. (Dkt. 93–16) SeaWorld's corporate representative testified that any refunds that were issued were considered mere "courtesies" or "goodwill adjustments," not unlike any other adjustments that SeaWorld might offer to an upset customer. (Dkt. 93–3 at P. 89:5–90:24) In 2013, SeaWorld revised its refund policy for EZ Pay out of commitment payments. As of July 15, 2013, employees were no longer permitted to issue *any* courtesy refunds to EZ Pay customers who had "unknowingly paid" any out of commitment payments. (Dkt. 93–19)

SeaWorld sold 131,097 one-year EZ Pay passes that auto-renewed following their initial term during the time period relevant to this action to individuals who resided in four different states at the time that they purchased their passes. (Dkt. 93 at P. 29) Based on Plaintiffs' proposed class definition, this putative class action potentially implicates 124,554 individuals. (Id.)

The issue of class certification has now been presented before the Court on extensive briefing by the Parties. (Dkt. 93, 99, 115)

### III. PLAINTIFFS' MOTIONS TO EXCLUDE EXPERTS

As an initial matter, the Court notes that Plaintiffs have filed motions seeking to exclude the opinions of two of SeaWorld's experts from the Court's consideration of the Motion for Class Certification.

#### a. Legal Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

■ Rule 702 compels courts to perform a "gatekeeping" function—specifically, to determine whether the proffered expert testimony is reliable and relevant. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 n. 7, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Eleventh Circuit has highlighted the importance of the gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). In determining the admissibility of expert testimony under Federal Rule of Evidence 702, the court applies a "rigorous" three-part inquiry. Id. Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id. The Eleventh Circuit describes these three distinct concepts separately as "qualification, reliability, and helpfulness." Id.

■ The "reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).

### b. Motion to Exclude Allan Metcalf

■ SeaWorld has submitted the opinion of its expert, Allan Metcalf, to support its argument that the phrase "paid for their pass in less than 12 months" as used in Plaintiffs' proposed class definition is ambiguous. (Dkt. 91–1) Metcalf's opinion notes that the phrase contained in Plaintiffs' proposed class definition is substantially similar to the disputed phrase contained in the EZ Pay contract. Metcalf opines that both phrases are ambiguous without the additional context provided within the four corners of the EZ Pay contract. Metcalf's ultimate conclusion in his report is: "Considering vocabulary, grammar, and the larger context [of the EZ Pay contract], the conclusion is ineluctable that 'less than 12 months' refers not to extent of time amounting to less than a year ... but number of monthly payments ...." (Dkt. 91–1 at P. 8)

■ Plaintiffs have moved to strike Metcalf's expert report pursuant to Federal Rule of Evidence 702 on the basis that it constitutes an improper legal conclusion of the ultimate contract interpretation issue in this suit. The Court agrees. Courts regularly exclude expert opinions that opine on the interpretation of written contracts. See, e.g., Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 n. 9 (11th Cir. 1990) (noting that interpretation of contracts is a question of law to be decided by the judge); McMahan Sec. Co. LP. v. FB Foods, Inc., 2007 WL 473666, at *2 (M.D. Fla. Feb. 8, 2007) (excluding an expert's opinion on the interpretation of a contract, noting "[g]enerally speaking, interpretation of a written contract is a matter of law to be determined by the court"); GuideOne Mutual Insurance Company v. Daniel, 2015 WL 5190853, at *1 (M.D. Ga. Sept. 4, 2015)("[t]he Court further finds that the expert testimony proffered by Defendants is not helpful to the Court's interpretation of the contract language at issue and grants Plaintiff's motion to exclude the testimony of Defendants' expert witness"). That SeaWorld purportedly offers Metcalf's opinion solely to argue that the phrase contained in Plaintiffs' proposed class definition (which is derived from and is substantially similar to the disputed phrase contained in

the EZ Pay contract) is ambiguous is of no moment. The ultimate interpretation question is the same. Accordingly, the Court **GRANTS** Plaintiffs' Motion to Strike Defendant's Expert Report of Allan Metcalf. (Dkt. 91)

### c. Motion to Exclude Joseph Egan

Plaintiffs seek to exclude the expert report of SeaWorld's expert, Joseph Egan, arguing that SeaWorld is using Egan as a conduit to introduce notes from SeaWorld's EZ Pay database to argue that individualized inquiries predominate over any common issues. (Dkt. 92) Plaintiffs specifically argue that Egan's report is not helpful to the trier of fact, that his report is not based on reliable information, and that his report contains impermissible legal opinions. (Id.)

■ Egan is an expert in database management, finance, and accounting who was retained by SeaWorld to organize, combine, query, and analyze several different datasets of information about tens of thousands of putative class members contained within SeaWorld's business records. SeaWorld produced in class discovery twelve spreadsheets from four different databases, amounting to ten million lines of data. Mr. Egan used his experience in database management to combine and analyze the information contained in these voluminous business records. Egan rendered opinions based on the combined data regarding the extent and method of individualized inquiry that may be required to identify class members and/or resolve SeaWorld's affirmative defenses. Unlike in the Legg case, cited by Plaintiffs, this analysis is not the type that a layperson or the Court could have just as easily performed. Legg v. Voice Media Group, Inc., 2014 WL 1767097, at *3–4 (S.D. Fla. May 2, 2014) (excluding expert's testimony in part because it took no specialized knowledge to count number of class members included on list produced in discovery). Accordingly, the Court finds that Egan's report is helpful.

■ Second, the Court does not find that it is improper for Egan's report to rely on notes about putative class members contained within SeaWorld's business records.

Experts may rely on inadmissible hearsay in forming their opinions. Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 2246, 183 L.Ed.2d 89 (2012) (citing Fed. Rule Evid. 703). In any event, Plaintiffs also have not shown that these records would not fall within the business records hearsay exception.

■ Third, the Court does not find that Egan's report contains impermissible legal conclusions. Egan opines on potential factual differences between the claims of the members of the putative class and the methodology by which such factual differences can or cannot be identified on a class-wide basis. By way of example, Egan's report includes examples of: communications between EZ Pay pass holders and SeaWorld representatives regarding the EZ Pay passes and auto-renewal; EZ Pay pass holders who had previously purchased EZ Pay passes that auto-renewed; and EZ Pay pass holders who purchased multiple passes where some passes were used after the expiration of the initial term while others were not. Egan opines that these differences cannot be identified without performing a manual review of each and every EZ Pay pass holder's account data, which is contained across different datasets.

SeaWorld relies on Egan's Report in its Response in opposition to Plaintiffs' Motion for Class Certification to argue that these individualized factual inquiries, which SeaWorld contends bear on the individualized intent of each EZ Pay pass holder, will predominate over common questions. However, Egan does not opine on whether individualized differences predominate such that class certification should be denied. This is the ultimate legal question that is left to the Court to decide.

Therefore, the Court rejects Plaintiffs' argument that Egan's report is not helpful, that it is based on unreliable information, and that it contains impermissible legal conclusions. Plaintiffs' mere disagreement with Egan's opinions or Plaintiffs' belief that the opinions are irrelevant goes to their weight and not their admissibility. Accordingly, Plaintiffs' Motion to Strike Egan's Report (Dkt. 92) is **DENIED.**

## IV. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### a. Class Certification Standard

A district court has broad discretion in determining whether to certify a class. Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1569 (11th Cir. 1992); Griffin v. Carlin, 755 F.2d 1516, 1531 (11th Cir. 1985). As a threshold matter, courts consider whether "the proposed class is adequately defined and clearly ascertainable." Palm Beach Golf Center–Boca, Inc. v. Sarris, 311 F.R.D. 688, 693 (S.D. Fla. 2015). Additionally, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." Klay v. Humana, Inc., 382 F.3d 1241, 1250 (11th Cir. 2004). The party seeking to maintain the class action must affirmatively demonstrate compliance with Rule 23. Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1187 (11th Cir. 2003). A class may be certified under Rule 23(a) only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are commonly referred to as the "numerosity, commonality, typicality, and adequacy of representation" requirements. Valley Drug, 350 F.3d at 1188. As to the additional requirement under Rule 23(b), Plaintiffs contend that the proposed class satisfies Rule 23(b)(3). Under Rule 23(b)(3), the Court must find "that questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id.

The burden of proof to establish the propriety of class certification rests with the advocate of the class, and failure to establish any one of the four Rule 23(a) factors and at least one of the alternative requirements of Rule 23(b) precludes class certification. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "[I]n deciding whether to certify the class, a court generally must take as true the allegations in the complaint, rather than determine the merits of the claim at the class certification stage." Butler–Jones v. Sterling Casino Lines, L.P., No. 6:08-CV-01186, 2008 WL 5274384, at *4, 2008 U.S. Dist. LEXIS 102256, at *4 (M.D. Fla. Dec. 18, 2008). More specifically, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013) (citing Dukes, 131 S.Ct. at 2552 n.6).

### b. Analysis

#### i. Ascertainability

Plaintiffs seek to certify a class under Count I (the breach of contract claim) to include:

a. All natural persons in the States of Florida, Texas, Virginia, and California;

b. within the applicable statute of limitations in their respective states;

c. who purchased a one-year pass to one of Defendant's theme parks in their respective states;

d. who funded the one-year pass through Defendant's "EZ Pay" system;

e. who paid for their one-year pass in less than 12 months; and

f. who were charged any additional amounts after the one-year pass was paid in full.

(Dkt. 93 at P. 22) Plaintiffs seek to certify a subclass under Count II (the EFTA claim) to include:

a. All natural persons in the States of Florida, California, Virginia and Texas;

b. who purchased a one-year pass to one of Defendant's theme parks in their respective states, and who funded the one-year pass through Defendant's "EZ Pay" system using a debit card;

c. who paid for their one-year pass in less than 12 months;

d. who were charged through an electronic fund transfer to their debit or bank account any additional amounts after the one-year pass was paid in full; and

e. such charges were made on or after the date one year prior to the filing of this action.

(Id.)

Excluded from the Breach of Contract Class and EFTA Subclass are: (i) all persons who received full refunds from SeaWorld after being charged any additional amounts after the one year pass was paid in full; (ii) all persons who continued to use their EZ Pay pass after the one-year pass had expired; (iii) managers, directors and employees of SeaWorld and members of their immediate families; (iv) all agents of SeaWorld; (v) legal counsel for Plaintiffs or SeaWorld and members of their immediate families; and (vi) all judges assigned to hear any aspect of this litigation, as well as their immediate family members. (Id.)

" 'An identifiable class exists if its members can be ascertained by reference to objective criteria. The analysis of the objective criteria also should be administratively feasible. Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual inquiry.' " Palm Beach Golf Ctr., 311 F.R.D. at 693 (quoting Bussey v. Macon Cnty. Greyhound Park, Inc., 562 Fed.Appx. 782, 787–88 (11th Cir. 2014)).[4]

4. The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36–2."

█ SeaWorld argues that Plaintiffs' proposed class and subclass are not readily ascertainable because they are too vague and confusing as currently defined. First SeaWorld argues that use of the phrase "who paid for their pass in less than 12 months" in both definitions "makes it impossible to objectively define class membership, at least in the way Plaintiffs intend." (Dkt. 99 at P. 52) SeaWorld asserts that Plaintiffs intend the class to include any individuals who paid their initial down payment and their last monthly installment (twelfth overall payment) within less than 365 days of each other. (Id. at P. 51) SeaWorld argues that the phrase "less than 12 months" is ambiguous and could either be interpreted to refer to customers who paid for their passes in a lesser duration than 12 months (i.e., less than 365 days), as Plaintiffs contend, or it could refer to customers who paid for their passes in less than 12 monthly countable payments, as SeaWorld contends. SeaWorld supports this argument by citing to the expert report of Allan Metcalf, which the Court has now excluded.

The Court rejects SeaWorld's argument and finds that the phrase is not ambiguous. According to its plain meaning, the phrase identifies individuals who paid for one-year EZ Pay passes in "less than 12 months." One need only count the period of time over which the payments were made and it is plainly clear that eleven (11) months is less than twelve (12) months.

█ SeaWorld's remaining challenges to the manner in which Plaintiffs have worded their proposed class definitions are merely technical. To the extent that the class definitions should be refined to more clearly cover the class of individuals affected by Sea-World's alleged conduct, the Court has discretion to redefine the class to provide the necessary precision. Fisher v. Ciba Specialty Chemicals Corp., 238 F.R.D. 273, 300 (S.D. Ala. 2006); see also 5 James Wm. Moore, Moore's Federal Practice § 23.24[7] (3d ed. 2007).

United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

SeaWorld contends that the phrases: "All natural persons *in* the States of Florida, Texas, Virginia, and California," and *"in* their respective states" are vague and confusing because it is unclear whether "in" means that the individual currently resides or formally resided in that state. SeaWorld also contends that the phrase "who *funded* the one-year pass through Defendant's 'EZ Pay' system" is confusing and inaccurate because customers execute the EZ Pay contract thereby obligating them to "fund" their passes with credit or debit cards over twelve (12) installment payments. Lastly, SeaWorld contends that the phrase "who were charged *any additional amounts* after the one-year pass was paid in full" is vague because literally any charge initiated by anyone satisfies this provision.

To address these concerns the Court redefines the classes as follows:

**Breach of Contract Class:**

a. All natural persons who purchased a one-year pass through Defendant's "EZ Pay" program to one of Defendant's theme parks located in the States of Florida, Texas, Virginia, and California;

b. who were residents of the state where the park is located at the time of purchase;[5]

c. who purchased the pass within the applicable statute of limitations for the respective states;

d. who paid for their one-year pass in less than 12 months; and

e. who were charged any additional monthly payments for renewal of the pass after the one-year pass was paid in full.

**EFTA Subclass:**

a. All natural persons who purchased a one-year pass through Defendant's "EZ Pay" program to one of Defendant's theme parks located in the States of Florida, Texas, Virginia, and California;

b. who were residents of the state where the park is located at the time of purchase;

c. who paid for their pass using a debit card;

d. who paid for their one-year pass in less than 12 months;

e. who were charged through an electronic fund transfer to their debit or bank account any additional monthly payments for renewal of the pass after the one-year pass was paid in full; and

f. such additional monthly payments were charged on or after the date one year prior to the filing of this action.

Excluded from the Breach of Contract Class and EFTA Subclass are: (i) all persons who received full refunds from SeaWorld after being charged any monthly payments for renewal of the pass after the one year pass was paid in full; (ii) all persons who continued to use their EZ Pay pass after the one-year pass had expired; (iii) managers, directors and employees of SeaWorld and members of their immediate families; (iv) all agents of SeaWorld; (v) legal counsel for Plaintiffs or SeaWorld and members of their immediate families; (vi) all judges assigned to hear any aspect of this litigation, as well as their immediate family members; (vii) and any class members in the matter of Gargir v. SeaWorld Parks & Entertainment, Inc., No. 37–2015–00008175–CU–MC–CTL, California Superior Court, San Diego County (the Gargir Action), who have specifically released and discharged SeaWorld from any claims they may have in this case as a result of the class action settlement approved in the Gargir Action.[6]

The Court finds that the Breach of Contract Class, as redefined, is readily ascertainable utilizing class-wide data that exists within SeaWorld's records. Indeed, it appears

---

**5.** In their Motion for Class Certification, Plaintiffs rely on a chart containing the number of putative members in the Breach of Contract Class and an estimation of their aggregate damages that was provided in discovery by SeaWorld. (Dkt. 93 at P. 15) The putative class members in each state bought passes to parks in the state in which they resided at the time of purchase. (Id.)

**6.** See SeaWorld's Notice of Judgment in a Related Action. (Dkt. 129)

that SeaWorld has already identified the number of members who fall within the redefined Breach of Contract Class and calculated their estimated aggregate damages. (Dkt. 93 at P. 15)

 SeaWorld argues that the EFTA Subclass is not readily ascertainable because SeaWorld does not keep records of whether customers used debit or credit cards to purchase EZ Pay passes. Plaintiffs argue that SeaWorld has the ability to retrieve the full card numbers from their payment processors for the members of the subclass. Plaintiffs assert that once they have the full card numbers, the debit card users can be identified by the first six digits of the card, which are referred to as "Bank Identification Numbers" ("BIN"). SeaWorld argues, however, that its disclosure of thousands of its customers' card numbers to Plaintiffs would violate industry standards and other "applicable laws."

The industry standards to which SeaWorld refers appear to be the "Payment Card Industry Data Security Standards" or "PCI DSS." (Dkt. 93 at P. 10; Dkt. 99–6 at P. 41) These standards are enforced by the credit card brands, i.e., MasterCard, Visa, American Express, and exist to thwart data breaches. (Dkt. 99–6 at P. 41) The PCI DSS protect a customer's "primary account number" ("PAN"), or the full sixteen digit card number, from being exposed. (Id.) The PCI DSS apply to any entity that acquires a PAN from a consumer, namely merchants and their payment processors. (Id.) SeaWorld and its payment processors must comply with the PCI DSS. (Id.) If a merchant does not comply with the PCI DSS the card brands reserve the right to revoke the license that allows the merchant to accept those card brands. (Id. at P. 36)

To comply with the PCI DSS, payment processors utilize a process called "tokenization" to protect a customer's PAN. (Id.) After the PAN is used to make a payment, the payment processor tokenizes the PAN, meaning that it converts the PAN to a different number. (Dkt. 93–31 at P. 6) If third parties obtained the tokenized PAN, they would be unable to use it. (Id.) Plaintiffs' expert, Peter Quadagno, states that in the event of a chargeback, SeaWorld's vendor has to be able to "de-tokenize" the PAN back to its original form. (Id.) According to Mr. Quadagno, SeaWorld has acknowledged that it has the ability to obtain the information (the PAN's and BIN number ranges [7]) needed to identify the members of the EFTA Subclass. (Id. at P. 7) SeaWorld has denied that it has the PAN's or the BIN's because its payment processor has tokenized the PAN's. (Id. at P. 7) Mr. Quadagno asserts that SeaWorld has access to the data because its payment processors [8] are its vendors, and obtaining the information would simply require SeaWorld to engage its vendors. (Id.)

SeaWorld has not argued that the de-tokenization of the PAN's is not possible. Nor has it argued that the members of the EFTA Subclass could not be identified by using the BIN ranges. SeaWorld simply argues that the data does not exist in its own databases. The Court finds that SeaWorld may not avoid class certification simply because it engages an off-site, third-party vendor to process payments and maintain records of the same. SeaWorld also argues that Plaintiffs have failed to acknowledge the potential implications that a mass de-tokenization would have on its customers' privacy and security or SeaWorld's regulatory compliance obligations. To this end, SeaWorld argues that Mr. Quadagno testified that SeaWorld could not simply disclose its customers' card numbers to Plaintiffs because it would be out of

---

7. Each card brand (i.e., MasterCard and VISA) assigns specific BIN number ranges according to payment types (credit, debit, or prepaid). (Dkt. 99–31 at P. 6) The payment processors know which type of card each BIN number range represents because they charge different fees for processing payments depending on the type. (Id.)

8. SeaWorld previously used a payment processor called 1st Data. (Dkt. 93–31) In February 2016,

SeaWorld began using a different payment processor called Freedom Pay. (Id.; Dkt. 99 at P. 55) Although SeaWorld argues that Freedom Pay uses a more "robust" system and Plaintiffs have failed to analyze this new system, Mr. Quadagno opined that the information needed could likewise be obtained from Freedom Pay, SeaWorld's vendor.

compliance with PCI DSS. (Dkt. 99–6 at P. 105–06)

The Court finds that there would be no risk to SeaWorld or its payment processor of losing their licenses for the failure to comply with the industry standards because any production of the information would be pursuant to a Court order. Furthermore, it does not appear that SeaWorld or its payment processor would be required to disclose the PAN's for the subclass to the Plaintiffs. All that is needed is disclosure of the fact that a certain class member used a debit card for a certain transaction. There is no dispute that the payment processor is able to de-tokenize the PAN and that it knows which BIN ranges are associated with debit card purchases. Indeed, it is also entirely possible that the payment processor might not even have to de-tokenize the PAN's to identify the debit card users because the payment processors must maintain a record of the different payment types to determine what fees to charge SeaWorld for its services. In any event, it appears that the payment processor should be able to, in a secure fashion or environment, produce a list identifying members of the class who paid "out of commitment" payments during the relevant time period with a debit card. To the extent that de-tokenization is required and a "mass" de-tokenization would not be considered safe for the purpose of preventing a possible security breach, it also appears that the payment processor could perform the de-tokenization on a smaller scale—in the same manner that tokenization or de-tokenization occurs when a payment transaction is processed. Although this would require more time and may be more expensive, it is still a mechanical method, readily available and necessary to determine the members of the subclass. Therefore, the Court finds that the EFTA Subclass is ascertainable.

SeaWorld also argues that the proposed class is overbroad in several respects. Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003) (a court should deny class certification where class definitions are overbroad). SeaWorld argues that Plaintiffs' proposed class definitions sweep in individuals who do not belong in the class. First, Sea-World argues that individuals who wanted their passes to auto-renew because they intend to use their passes in the future should not be included in the class. This argument is rejected for the reasons discussed under the predominance section below in regard to SeaWorld's "knowledge-based" affirmative defenses. Second, SeaWorld argues that individuals who purchased multiple passes should not be included in the class when some of those passes were used after the one year period but others were not. These individuals will only be able to recover on the passes that were not used. To the extent that SeaWorld contends these individuals therefore knew about auto-renewal and should not be included in the class, this argument is also duplicative of SeaWorld's knowledge-based defenses. Third, SeaWorld argues that individuals who received a full refund via a chargeback from their bank should not be included in the class. This argument is rejected for the reasons discussed under the predominance section below in regard to Sea-World's affirmative defense of set-off.

Lastly, SeaWorld argues that all customers who purchased passes to its Busch Gardens Williamsburg park should be excluded because those individuals *might* be subject to an arbitration agreement if they purchased their EZ Pay passes via the website for that park. This issue was addressed as to named Plaintiff Christina Lancaster in the Order denying SeaWorld's motion to compel arbitration of her individual claim. (Dkt. 121) In that Order, the Court found that Lancaster's claim was not subject to arbitration because she did not have actual or constructive knowledge of an arbitration agreement contained on a separate webpage entitled "Terms and Conditions," the link to which is buried at the bottom of the Busch Gardens Williamsburg website. (Id.) SeaWorld contends that because Plaintiffs have not identified an administratively feasible method for separating out the Busch Gardens Williamsburg customers who purchased their passes via the website instead of at the park or over the phone, all Busch Gardens Williamsburg customers must be excluded.

However, "that some of the class members claims may be affected by arbitra-

tion agreements does not make class certification inappropriate." Rosen v. J.M. Auto Inc., 270 F.R.D. 675, 679 (S.D. Fla. 2009), order vacated in part on reconsideration (May 26, 2009) (cited portion not vacated); Gregory v. Preferred Fin. Sols., No. 5:11-CV-422 MTT, 2013 WL 6632322, at *8 (M.D. Ga. Dec. 17, 2013) (same). The issue of the Busch Gardens Williamsburg class members' arbitration agreements is not properly before the Court at the class certification stage. See Rosen, 270 F.R.D. at 679. Moreover, the burden would be on SeaWorld, not Plaintiffs, to raise the issue and to affirmatively identify which specific class members SeaWorld contends are subject to binding arbitration and a class action waiver. See Gregory, 2013 WL 6632322, at *8 (noting that defendants had "not presented any evidence of how many putative class members they claim are subject to binding arbitration clauses," and that it was not the plaintiffs' burden to make this showing). Courts dealing with this same issue have proceeded to certify a class while "reserv[ing] the right to create subclasses or exclude members from the class at a later juncture." Espinoza v. Galardi S. Enterprises, Inc., No. 14-21244-CIV, 2016 WL 127586, at *12–13 (S.D. Fla. Jan. 11, 2016) (citation omitted); Gregory, 2013 WL 6632322, at *8; Collins v. Int'l Dairy Queen, Inc., 168 F.R.D. 668, 678 (M.D. Ga. 1996), modified, 169 F.R.D. 690 (M.D. Ga. 1997). The Court therefore reserves the right to consider creating a subclass or decertifying a portion of the class at a later time, if necessary.

In accordance with the foregoing discussion, the Court rejects SeaWorld's challenges to the ascertainability and scope of Plaintiffs' class and subclass. The Court finds that the ascertainability requirement is met with respect to the redefined classes.

### ii. Numerosity

The numerosity requirement "imposes a 'generally low hurdle' and a plaintiff need not show the precise number of members of the class." Palm Beach Golf Ctr., 311 F.R.D. at 695. The general rule "in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" Manno v. Healthcare Revenue Recovery Grp., LLC, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (quoting Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986)). Evidence produced by SeaWorld establishes that approximately 124,554 individuals fall within the Breach of Contract Class. (Dkt. 93 at P. 15)

Plaintiffs have submitted evidence establishing that the number of class members in the EFTA Subclass likely exceeds 21,000 members. (Dkt. 93–31) Plaintiffs' expert, Mr. Quadagno, arrived at this estimate by utilizing data from a 2013 Federal Reserve Study on the type of payment products used by consumers in the United States, from which he found that 66.38% of non-cash (credit or debit card) transactions processed during 2012 were debit card transactions. (Id.) SeaWorld has disclosed that 31,994 class members were charged their first "out of commitment" payment through either a bank-issued debit or credit card within the relevant statute of limitations period for the EFTA claims. Thus, according to Mr. Quadagno, the EFTA subclass likely consists of at least 21,000 members (31,994 x 66.38% = 21,237.6172). (Id.) The Court finds that Mr. Quadagno's estimate provides a sufficient factual basis for determining at this point that the numerosity requirement is met as to the EFTA subclass. See Vega v. T–Mobile USA, Inc., 564 F.3d 1256, 1267 (11th Cir. 2009) (plaintiffs need not make a precise showing of the number of members in the class but must provide the court with some means to make a factual determination that the numerosity requirement is met).

Therefore, the Court finds that the numerosity requirement is clearly met.

### iii. Commonality

Commonality requires the identification of an issue that by its nature "is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S.Ct. at 2551. Commonality is a "relatively light burden." County of Monroe, Fla. v. Priceline.com, Inc., 265 F.R.D. 659, 667 (S.D. Fla. 2010) (internal quotation marks omitted). The commonality

requirement "does not require that all the questions or law and fact raised by the dispute be common." Id. Commonality is satisfied if the case "involve[s] issues that are susceptible to class wide proof." Garcia–Celestino v. Ruiz Harvesting, Inc., 280 F.R.D. 640, 646 (M.D. Fla. 2012) (internal quotation marks omitted). An alleged policy or practice of treating an entire class unlawfully satisfies the commonality requirement of Rule 23(a)(2). Cox, 784 F.2d at 1557–58; see also Palm Beach Golf Ctr., 311 F.R.D. at 695. Moreover, "[i]t is the form contract, executed under like conditions by all class members, that best facilitates class treatment." Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1171 (11th Cir. 2010); see also Allapattah Serv., Inc. v. Exxon Corp., 333 F.3d 1248, 1260–61 (11th Cir. 2003) (affirming class certification for breach of contract claim where the contracts were materially similar and defendant had acted the same with respect to the entire class); Kleiner v. First Nat'l Bank of Atl., 97 F.R.D. 683, 692 (N.D. Ga. 1983) (collecting cases supporting the proposition that "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such").

The predominant issue in this case is an overarching common merits issue—whether SeaWorld breached the terms of the EZ Pay contract by continuing to charge one-year pass holders additional "out of commitment" payments after their initial pass term had ended. Likewise, the question whether SeaWorld violated the EFTA with respect to the EFTA Subclass is duplicative of the breach of contract claim. If SeaWorld breached the terms of the EZ Pay contract, then it likely violated the EFTA because it was not permitted to initiate a transfer from the subclass members' bank accounts after the initial one-year term without express authorization. To resolve the question of breach the Court must determine the proper interpretation of the disputed contract phrase: "PAID IN LESS THAN 12 MONTHS." According to SeaWorld, this question will require individu-

alized determinations because the phrase is ambiguous. The Court notes that this is the first instance in which SeaWorld has asserted that the disputed contract phrase is ambiguous. Initially, SeaWorld contended that, when considering the disputed phrase in context of the entire EZ Pay contract, its meaning was clear: paid in less than twelve (12) countable monthly payments.[9] SeaWorld now argues that because the disputed contract phrase is ambiguous it will be entitled to submit extrinsic evidence bearing on the individualized intent of each putative class member, including: the manner of purchase (online, by phone, or at the park); any communications the pass holder had with SeaWorld employees regarding the EZ Pay pass; and any past experiences the pass holder had with the EZ Pay program, i.e., whether they had previous EZ Pay passes that auto-renewed.

▬ Under the laws of every state pertinent to this action, a contract term is ambiguous if it is susceptible to more than one *reasonable* interpretation. Oceanside 84, Ltd. v. Fid. Fed. Bank, 56 Cal.App.4th 1441, 66 Cal.Rptr.2d 487, 492 (1997); Penzer v. Transportation Ins. Co., 29 So.3d 1000, 1005 (Fla. 2010); Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996); Nationwide Mut. Ins. Co. v. Tomlin & O'Keefe Investments, Inc., 22 Va. Cir. 207, 1990 WL 10039276 (Va. Cir. Ct. 1990). Florida, Virginia, and Texas are "plain meaning" states, which means that when contract terms are plain and unambiguous, courts must give effect to the meaning of the contract as written without considering any extrinsic evidence of the parties' intent. (See Dkt. 93-37 at P. 1–5) Similarly, under California law, "[t]he language of the contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. When interpreting a contract, the parties' objective intent, "as evidenced by the words of the contract, is controlling." Lloyd's Underwriters v. Craig & Rush, Inc., 26 Cal.App.4th 1194, 32 Cal.Rptr.2d 144, 145-46 (1994). Courts should "interpret the intent and scope

---

**9.** Notably, SeaWorld submitted the Report of Allan Metcalf in support of its Response in opposi-

tion to Plaintiffs' Motion for Class Certification, which contains this same conclusion.

of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made." Id.

■ The only marginal difference between the application of the law of the "plain meaning" states and California is that under California law, the court "provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." Wolf v. Superior Court, 114 Cal.App.4th 1343, 8 Cal. Rptr.3d 649, 656 (2004), as modified on denial of reh'g (Feb. 19, 2004). Thus, SeaWorld contends that under California law, it will be entitled to provisionally submit its individualized evidence of each class member's intent even before the Court makes a determination as to whether the disputed contract phrase is ambiguous.

■ To satisfy the commonality requirement, Plaintiffs must demonstrate not only that common questions exist but that use of the class action proceeding will generate common answers to those questions. Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Thus, a common issue must be central to the validity of each class member's claim and be capable of resolution in one broad stroke. Id. In Dukes, the Supreme Court recognized that it may sometimes be necessary for the court to "probe behind the pleadings before coming to rest on the class certification question." Id. at 351, 131 S.Ct. 2541. In that case, plaintiffs sought to certify a nationwide class of individuals who worked for Wal–Mart owned stores and who were allegedly discriminated against on the basis of their sex in violation of Title VII of the Civil Rights Act. Id. at 343, 346, 131 S.Ct. 2541. Although discrimination claims would normally require individualized inquiry into the circumstances of each class member's alleged discrimination, the Court found that a common issue would exist if the plaintiffs could prove that Wal–Mart had engaged in a "pattern or practice" of discrimination. Id. at 351, 131 S.Ct. 2541. Finding plaintiffs' evidence on this point insufficient, the Court affirmed the denial of class certification in the case. Id. at 353–59, 367, 131 S.Ct. 2541.

Later, in Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013), the Supreme Court clarified that although Rule 23 does not grant court a "license to engage in free-ranging merits inquiries at the certification stage," the merits of the claims "may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." Id. at 1194–95. Here, consideration of the question whether the disputed contract provision is ambiguous is warranted to determine whether the commonality requirement is met. If the disputed contract phrase is not ambiguous, the question of breach will be resolved in one broad stroke for all class members. Furthermore, the Court does not find that the Parties would be prejudiced by such a determination being made at this juncture because the Parties have briefed the ambiguity issue on summary judgment and in relation to the class certification motion. Additionally, SeaWorld has invited such a ruling by arguing that the nearly identical phrase contained in the class definition and derived from the contract is ambiguous and confusing.

■ Upon review of the contract as a whole, the Court finds that the phrase "PAID IN LESS THAN 12 MONTHS" is unambiguous. According to its plain, ordinary, and grammatical meaning, the phrase means exactly what it says, "paid in less than 12 months"—that is—a lesser duration than twelve (12) full months. As pointed out by Plaintiffs in their Motion for Summary Judgment, other courts have found that when used in a contract or a statute, the term "months" means "calendar months" or the "period of time elapsing between a given date and the corresponding date" during the next month. State v. White, 73 Fla. 426, 431, 74 So. 486 (Fla. 1917); see also Sheets v. Selden's Lessee, 69 U.S. 177, 190, 2 Wall.

177, 17 L.Ed. 822 (1864) ("the term ['months'] is not technical, and when the parties have not themselves given to it a definition, it must be construed in its ordinary and general sense, and there can be no doubt that in this sense calendar months are always understood."); Fogel v. C. I. R., 203 F.2d 347, 349 (5th Cir. 1953) (same); Hayward Lumber & Inv. Co. v. Corbett, 138 Cal.App. 644, 651, 33 P.2d 41 (Cal. Ct. App. 1934) ("It has been held repeatedly that a month, when used to designate the passage of time under a contract or statute, means a calendar month."); Seibert v. Sally, 238 S.W.2d 266, 267 (Tex. Civ. App. 1951) (same); Barrack v. Com., 142 Va. 596, 601, 128 S.E. 638 (Va. 1925) (same). A "period of months" is calculated by "looking at the calendar, and it runs from a given day in one month to a day of the corresponding number in the next or specified succeeding month." Gardner v. Universal Life & Acc. Ins. Co., 164 S.W.2d 582, 583 (Tex. Civ. App. 1942). A period of "twelve months" is therefore equal to one full calendar year.

A review of other terms and provisions contained in the EZ Pay contract does not alter the Court's conclusion. SeaWorld contends that because the contract states that it is a one-year voucher and because the number of payments required is twelve (12), its interpretation that "PAID IN LESS THAN 12 MONTHS" means "paid in less than 12 monthly installments" or "paid in less than 12 separate months" is reasonable. The Court disagrees. Under the plain terms of the contract, a pass may be "PAID IN LESS THAN 12 MONTHS" even though a pass holder makes twelve separate payments and receives a one-year pass in return. To reach SeaWorld's interpretation the Court would have to write additional language into the contract, which it is not permitted to do. Dahl–Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993) ("Courts may not rewrite contracts or add meaning to create an ambiguity."). SeaWorld drafted the form contract and if it meant "less than 12 monthly payments," it could have said so. The Court also finds unpersuasive SeaWorld's argument that the Court should find that the phrase is reasonably susceptible to SeaWorld's interpretation because "less" is sometimes *misused* to refer to countable items. The Court finds that interpreting the meaning of contractual terms according to a common "misusage" would not be reasonable. See, e.g., JRG Capital Inv'rs I, LLC v. Doppelt, 2012 WL 2529256, at *3 (S.D. Tex. June 28, 2012) ("Courts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction.") (quoting Gen. Fin. Services, Inc. v. Practice Place, Inc., 897 S.W.2d 516, 522 (Tex. App. 1995)).

Because the Court has found that the disputed contract provision is unambiguous, the commonality requirement is met, at least as to the putative class members whose claims are governed by the laws of Florida, Texas, and Virginia, because no extrinsic evidence shall be permitted to vary the meaning of the contract's plain and unambiguous terms.

The Court finds that the same conclusion will follow for the California putative class members. However, in order to determine the ambiguity question under California law, the Court is required to "provisionally" review any extrinsic evidence that *could make the disputed contract phrase susceptible to more than one reasonable interpretation.* However, the Court does not find that the type of individualized extrinsic evidence that SeaWorld intends to submit on this question renders its preferred interpretation reasonable. The evidence as a whole consists of circumstances during which SeaWorld sales representatives may have communicated to the putative class members that the EZ Pay passes would auto-renew after the initial term ended or the fact that SeaWorld had previously auto-renewed EZ Pay passes held by that same pass holder. However, one cannot vary or contradict the clear and explicit terms of a written agreement by submitting evidence of a contradictory interpretation even under California law. See Winet v. Price, 4 Cal.App.4th 1159, 6 Cal. Rptr.2d 554, 558 (1992) ("parol evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible,' not to flatly contradict the express terms of the agreement.") (citation omitted).

Additionally, the EZ Pay contract contains a provision at the bottom of the agreement in all caps that states: "I ACCEPT THE TERMS OF THIS AGREEMENT. I ACKNOWLEDGE RECEIPT OF THIS DOCUMENT." (Dkt. 93–4, 93–5) In this regard, SeaWorld's corporate representative has testified that it would be improper to "incorporate any other terms outside" of the EZ Pay contract into the agreement. (Dkt. 93–3 at P. 141:18–25)

Accordingly, the Court finds that notwithstanding any extrinsic evidence that SeaWorld has or intends to provisionally submit to suggest that on its authority its representatives orally modified the terms of the contract or that its customers acquiesced in a prior breach of a previous contract by SeaWorld, the disputed contract phrase at issue in this case is clear and explicit under California law. Therefore, no individualized extrinsic evidence will be admitted to bear on the meaning of the phrase.

Because the Court has resolved the ambiguity question, the question of breach of the contract (and violation of the EFTA) is a common issue that can be resolved in one broad stroke on a class-wide basis.[10] Thus, the commonality requirement is met.

#### iv. Typicality

■■■ To satisfy the typicality requirement, the class representative must have the same interest and suffer the same injury as the class members. Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1322 (11th Cir. 2008) (citing Cooper v. Southern Co., 390 F.3d 695, 713 (11th Cir. 2004)). The main focus of the typicality requirement is that the named plaintiffs will advance the interests of the class members by advancing their own interests. Agan v. Katzman & Korr, P.A., 222 F.R.D. 692, 698 (S.D. Fla. 2004). " 'Typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.' " Cooper v. Southern Company, 390 F.3d 695, 713 (11th Cir. 2004) (quoting Prado–Steiman v.

Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)). The typicality requirement, much like the commonality requirement, does not require that the claims of the proposed class representative and the proposed class be identical. Prado–Steiman, 221 F.3d at 1279. The requirement may be met "even if some factual differences exist between the claims of the named representatives and the claims of the class at large." Id. All that is required is that "the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory." Agan, 222 F.R.D. at 698 (citing Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984)). Generally, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." Prado–Steiman, 221 F.3d at 1279.

■■■ Here, the claims of the named Plaintiffs are typical of the claims of the proposed class members. Like the members of the proposed class, Plaintiffs all purchased one-year EZ Pay passes to one of SeaWorld's parks located in their state of residence, executed the same form EZ Pay contract, paid for their passes in less than twelve (12) months, and were charged additional monthly payments for the renewal of their passes after the one-year pass was paid in full. With respect to the EFTA Subclass, Plaintiff Kratt paid for his one-year EZ Pay pass using a debit card. Thus, Plaintiffs were subjected to the same course of conduct as the members of the class and their claims rest on the same legal theory. To the extent that SeaWorld argues that there are certain factual differences between the claims of the named Plaintiffs and the class members, the Court finds that any such factual differences relate to SeaWorld's potential affirmative defenses and do not defeat a finding of typicality.

Accordingly, the Court finds that the typicality requirement is met.

---

10. In accordance with the Dukes and Amgen decisions, the Court has only addressed the merits of the claims asserted to the extent necessary to determine if common issues exist. Accordingly, the Court will resolve any remaining merits issues related to the claims—including SeaWorld's contention that there was no breach because the contract terminated after one year—on consideration of the Parties' cross-motions for summary judgment.

#### v. Adequacy

Under Rule 23(a)(4), Plaintiffs must show that, as class representatives, they will fairly and adequately protect the interests of the class. The adequacy evaluation encompasses two inquiries: (1) whether any substantial conflicts of interest exist between the representative and the class; and (2) whether the representative will adequately prosecute the action. See Sosna v. Iowa, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). SeaWorld argues that a substantial conflict of interest exists between the named Plaintiffs and a number of members of the class because, while Plaintiffs allege that they were harmed by SeaWorld's auto-renewal of their EZ Pay passes, other members of the class benefitted from SeaWorld's auto-renewal. To support its argument, SeaWorld relies on Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181 (11th Cir. 2003), and Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000), for the proposition that "[a] fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." Valley Drug, at 1189; see also Pickett, at 1280.

Pickett involved a challenge to advance pricing of cattle through "forward contracts," which the plaintiffs contended illegally depressed pricing for cattle sellers who sold on the spot. The defendants successfully argued that a class of all cattle sellers improperly included those sellers who benefitted from the advance sales price. Valley Drug involved competing segments of a putative class that the court concluded could not be certified because some class members had benefitted from and others had been harmed by the alleged monopolistic pricing of a drug.

SeaWorld argues that this case likewise involves a proposed class that includes individuals who received a net economic benefit from the same conduct that Plaintiffs assert injured them. According to SeaWorld, individuals who have yet to return to the park after their initial one-year term has ended may have wanted their passes to renew and are actually benefited by the alleged breach because they are able to "lock-in" the same monthly rate that applied when they initially executed the EZ Pay contract. However, the Court finds that the circumstances involved in this case are wholly distinguishable from those involved in Pickett or Valley Drug.

First, and perhaps dispositive of this assertion, the purported "benefit" of a "locked-in price" is not contained within the plain terms of the EZ Pay contract. Even though SeaWorld contends that the agreement would purportedly auto-renew on a month-to-month basis after the one-year initial commitment period expired, SeaWorld does not guarantee pass holders the same rate. Indeed, the only language contained in the contract that speaks to the applicable rate after the initial pass term expires states that SeaWorld retains the right to change the rate. (See Dkt. 93–4) ("I may cancel my automatically renewed pass(es) at any time after the first full EZ Pay Plan has expired. *[SeaWorld] will advise me of any rate changes.*") (emphasis added).

Additionally, this case involves an alleged breach on a class-wide basis of a form contract with objectively defined terms and limitations of rights. Therefore, the subjective desires of individual members of the putative class are of no moment. See, e.g., In re Checking Account Overdraft Litigation, 307 F.R.D. at 646 ("[t]he reasonable expectations of a party to a form contract are judged objectively, from the perspective of a reasonable person, making the subjective views of class members irrelevant"); see also Restatement (Second) Contracts § 211(2) (a standardized contract "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing."). Moreover, this is not a situation, like the one involved in Pickett, in which the potential harm or benefit afforded to class members depends on the defendant's divergent treatment of the class members under the different types of agreements. Here, every putative class member executed the same form contract and suffered the same alleged injury—SeaWorld continued to charge the class members' credit and debit cards when SeaWorld was not entitled to do so under the objective terms of the contract.

Finally, even if intent were relevant, the class definition expressly excludes those individuals who have subsequently visited the parks under the allegedly unauthorized renewed passes and thus it excludes those, if any, who have enjoyed or would most likely have desired any benefit from a locked-in price in a subsequent period.

Therefore, the Court finds that there is no conflict between the interests of the named Plaintiffs and the proposed class members. Additionally, the Court finds that the named Plaintiffs [11] will adequately prosecute the action on behalf of the class and that proposed class counsel are qualified, experienced, and able to conduct the litigation. Accordingly, the adequacy requirement is met.

### vi. Predominance and Superiority

Rule 23(b)(3) requires "that questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The requirement that common questions of law or fact predominate means "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." Kerr v. City of West Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989). Regarding the predominance requirement, "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." Klay v. Humana, Inc., 382 F.3d 1241, 1254 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). Common issues do not predominate if "as a practical matter, the resolution of ... [an] overarching common issue breaks down into an unmanageable variety of individual

legal and factual issues." Babineau v. Fed. Exp. Corp., 576 F.3d 1183, 1191 (11th Cir. 2009).

SeaWorld contends that a class should not be certified in this action because individualized inquiries will predominate over common issues. First, SeaWorld contends that predominance is defeated by the individualized inquiries into the circumstances of each class member's purchase of their EZ Pay pass and their subjective intentions when entering into the contract. As discussed above, such inquiries will not be necessary because the disputed contract phrase is not ambiguous. Additionally, the evidence necessary to prove the breach of contract claim is essentially identical to the evidence necessary to identify the class members: whether they purchased one-year EZ Pay passes to one of SeaWorld's parks located in their state of residence during the applicable statute of limitations period; whether they paid for their passes in less than twelve (12) months; and whether they were automatically charged additional monthly payments for the renewal of their passes after the one-year pass was paid in full. For proof of a violation of the EFTA, the only additional evidence required is whether the pass holder used a debit card. All of this information is readily available from SeaWorld's databases or the databases of its payment processing vendors.

This evidence has a direct impact on every class member's effort to establish liability and every class member's entitlement to relief. Klay, 382 F.3d at 1255. SeaWorld's corporate policy was to auto-renew all one-year EZ Pay passes as a matter of course notwithstanding the contrary language contained in the contract, unless the customer affirmatively called to cancel the auto-renewed contract. Additionally, SeaWorld had uniform policies dictating how it would address customers who complained and sought refunds. Where corporate policies "constitute the very heart of the plaintiffs' ... claims,"

---

11. Named Plaintiff William Cohen passed away on November 24, 2016. (Dkt. 133) Plaintiffs' counsel served a Suggestion of Death on Cohen's surviving spouse, Marie Cohen, on December 20, 2016. (Dkt. 134) Absent a motion for substitution, Cohen's individual claim in this case will be

dismissed on March 20, 2017 pursuant to Federal Rule of Civil Procedure 25(a)(1). Because Ms. Cohen has advised Plaintiffs' counsel that she has no intention of further pursuing Cohen's claim on his behalf (Dkt. 133), the Court will not appoint him as a class representative at this time.

as they do here, common issues will predominate because those policies "would necessarily have to be re-proven by every plaintiff." Id. at 1257; see also Allapattah, 333 F.3d at 1261.

 Additionally, even though the damages owed to class members may vary depending on the amount of the monthly payment and the number of "out of commitment" payments that were charged by SeaWorld and not refunded, damages can be easily calculated utilizing class-wide data available from SeaWorld. The fact that individualized damages issues will need to be resolved is not disqualifying of class certification. See Allapattah, 333 F.3d at 1261 ("the presence of individualized damages issues does not prevent a finding that the common issues in the class predominate.") (internal citations omitted); Sacred Heart, 601 F.3d at 1179 (individualized damages issues are least likely to defeat predominance when they may be calculated according to "essentially mechanical methods"); Mills v. Foremost Ins. Co., 511 F.3d 1300, 1310 (11th Cir. 2008) (class treatment appropriate where plaintiffs contended that damages could be determined "with relative ease through basic forensic accounting" using defendant's own data). Indeed, SeaWorld has already identified the number of potential members in the Breach of Contract class and their aggregate damages in response to discovery requests. Any additional damages due to members of the EFTA Subclass will also be easily determinable because Plaintiffs only seek statutory damages.

 The Court also finds that the application of multi-state contract law does not preclude a finding of predominance. When seeking certification of a class for which the laws of multiple states apply, the named plaintiffs must submit a "more than perfunctory" showing that there are no material variations among the law of the applicable states, or if variations do exist, they are manageable. Sacred Heart, 601 F.3d at 1180. There is only one minor difference in the law of California relating to the issue of ambiguity. As reflected above in the Court's analysis under the commonality requirement, this variation is not unmanageable; indeed, it is not relevant.

 Second, SeaWorld contends that the predominance requirement is not met because substantial individualized inquiries will be required to resolve its affirmative defenses. However, as recently noted by the Supreme Court, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" Tyson Foods, ── U.S. ──, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–24 (3d ed. 2005)).

SeaWorld's "knowledge-based defenses" (waiver, estoppel, modification, novation, and ratification) are premised on SeaWorld's argument that some members subjectively knew about auto-renewal but did not terminate their contracts. (See Dkt. 93–35 (applying waiver and estoppel "to anyone who accepted the contract and acknowledged they were bound by it;" applying modification and novation to "guests who received an explanation of the automatic renewal provision and remained an EZpay pass holder;" applying ratification to "guests who knew about auto[-]renewal and did not terminate")) SeaWorld argues in its Response that pass holders who learned about auto-renewal by either reviewing their credit card statements or by calling and having a conversation with a SeaWorld representative may have waived their breach of contract rights or ratified SeaWorld's illegal contract due to their own inaction.

 However, as Plaintiffs note, these knowledge-based defenses require pass holders to have full knowledge of the terms of the EZ Pay contract. For example, as to the defense of waiver/estoppel, under the laws of each of the four states, SeaWorld would have to prove an intentional relinquishment of a known right. See e.g., Outboard Marine Corp. v. Superior Court, 52 Cal.App.3d 30, 124 Cal.Rptr. 852 (1975); Husky Rose, Inc. v.

Allstate Ins. Co., 19 So.3d 1085, 1088 (Fla. 4th DCA 2009); Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc., 995 S.W.2d 192, 195 (Tex. App. 1999); Baumann v. Capozio, 269 Va. 356, 611 S.E.2d 597, 599 (2005). Ratification similarly requires *full knowledge* of all material facts and circumstances. See Munroe v. Fette, 1 Cal.App. 333, 82 P. 206, 207 (1905); Frankenmuth Mut. Ins. Co. v. Magaha, 769 So.2d 1012, 1022 (Fla. 2000); Motel Enterprises, Inc. v. Nobani, 784 S.W.2d 545, 547 (Tex. App. 1990); Kilby v. Pickurel, 240 Va. 271, 275, 396 S.E.2d 666 (Va. 1990). Novation and/or modification requires the existence of a previously valid contract, agreement from all parties to a new contract, extinguishment of the original contract, and validity of the new contract. See e.g., O'Reilly v. Johnson, 91 Cal.App.2d 729, 205 P.2d 716 (1949); Young v. Morris Realty Co., 569 So.2d 813, 814 (Fla. 1st DCA 1990); Talamas v. Bressi International, 727 S.W.2d 72 (Tex. App. 1987); Wheeler v. Wardell, 173 Va. 168, 3 S.E.2d 377, 380–81 (1939).

SeaWorld argues that customers did have "full knowledge" of SeaWorld's actions because they had knowledge of the fact that SeaWorld had auto-renewed their passes. On this point, the Court finds persuasive the reasoning of the court in Allen v. Holiday Universal, 249 F.R.D. 166 (E.D. Pa. 2008), which addressed circumstances similar to those that arise in this case. In Allen, the plaintiffs filed a putative class action alleging that the defendants' health club form contracts charged excessive and unlawful initiation fees. Id. at 169. The defendants argued that a class could not be certified because it included "current members who do not wish to void their contracts" and that "liability depends upon the application of the affirmative defense of ratification, which, in turn, depends upon the circumstances and actions of each individual member." Id. at 171. The court held that the defense of ratification could not preclude class certification because the class members could not obtain "full knowledge of all material facts," including how the form contract properly applied and whether the defendants' acts taken pursuant to that contract were unlawful, until a ruling was made on the contract. Id. at 174–75.

Here, although some class members may have been aware that SeaWorld had auto-renewed their contract, they could not have been aware of the lawfulness of SeaWorld's conduct until either liability is established or SeaWorld admits that its actions were unlawful. The Court rejects SeaWorld's contention that a pass holder could have gained "full knowledge" of the proper interpretation of the auto-renewal provision through subsequent conversations with SeaWorld representatives because SeaWorld's uniform policy was to inform pass holders that all one-year EZ Pay passes auto-renewed as a matter of course, which is contrary to the contract's plain and unambiguous terms. See, e.g., In re Checking Account Overdraft Litig., 307 F.R.D. 630, 651 (S.D. Fla. 2015) (holding that plaintiffs could undercut defendant's affirmative defenses of ratification, waiver, voluntary payment, and failure to mitigate through the use of common evidence of defendant's misinforming its customers regarding its assessment of overdraft fees). When SeaWorld communicated to its customers that their passes would auto-renew on a month-to-month basis until the customer called to cancel (omitting the qualification language that this provision only applied to passes "PAID IN LESS THAN 12 MONTHS"), SeaWorld misinformed its customers about the parties' rights and obligations under the form EZ Pay contract—the only agreement intended to set forth the parties' obligations.

Plaintiffs contend that SeaWorld's "settlement" defenses (accord and satisfaction, compromise and settlement) also do not defeat a finding of predominance. SeaWorld intends these defenses apply to any customers who received a refund or services in compromise or settlement of their claim. (Dkt. 93–35) Any individuals who received a full refund for all of the "out of commitment" charges made to their accounts have been excluded from the class. Thus, the class members who received refunds have only received partial refunds. As to its settlement defenses, SeaWorld will be required to prove that the parties actually entered into superseding agreements with the intent to settle their existing breach of contract or EFTA dispute. SeaWorld therefore contends that individualized inquiries into each class member's intent regarding

the refund will be required. However, there is common proof on the record that *Sea-World* did not intend to effectuate a settlement of legal claims when it offered partial refunds to its customers. SeaWorld's corporate representative testified that refunds were given as a mere "courtesy" or "goodwill adjustment." (Dkt. 93–3 at P. 89:5–90:24) This is also reflected in the document detailing the July 2013 change to SeaWorld's refund policy, which states: "[I]n the past, you have been able to issue up to three months refund on accounts that auto[-]renewed beyond commitment, *as a courtesy to the guest.*" (Dkt. 93–19 (emphasis added))

SeaWorld's "damages" defenses (set-off and failure to mitigate damages) also do not preclude a finding of predominance. As to set-off, SeaWorld disclosed during the deposition of its corporate representative that the set-off defense "applies to anyone who did not make all [of] the in-commitment payments for the EZpay Pass, or otherwise owes SeaWorld money." (Dkt. 93–35) However, the class only includes individuals who made all of the "in-commitment" payments on their passes. SeaWorld asserts that there may be individuals who still owe SeaWorld money for failing to pay under a prior or different EZ Pay pass. If this is true for any individual class member, SeaWorld should be able to easily determine whether and how much money a class member owes it from its own records.

SeaWorld also contends that it would be entitled to a set-off for some class members who may have received a "chargeback" directly from their bank or credit card company if and when the class member disputed SeaWorld's charges. SeaWorld generally asserts, without citation to any direct legal authority, that class members cannot assert their bank or credit company's "chargeback rights" in this action. However, SeaWorld does not state that it has already issued full refunds to either the class member or the class member's bank or credit card company. If a bank or credit card company or other payment processor involved in the chain of the chargeback has a right of repayment from SeaWorld under these circumstances, this is a claim available to the bank, credit card company, or payment processor and may be pursued as a lien against the class member's recovery in this suit. Accordingly, the Court finds that SeaWorld likely cannot assert the affirmative defense of set-off to a class member's potential recovery where a class member has received a chargeback as a result of a dispute filed with their bank or credit card company.

Even if SeaWorld later establishes that it is entitled to assert a set-off defense because it has processed a payment as a result of a chargeback, SeaWorld should be able to determine the amount based on its own records or the records of its payment processors. Because the affirmative defense of set-off operates only to reduce an individual class member's damages, the assertion of the defense against some class members generally will not defeat class certification. See, e.g., James D. Hinson Elec. Contracting Co. v. BellSouth Telecommunications, Inc., 275 F.R.D. 638, 647–48 (M.D. Fla. 2011) ("[Defendant]'s set-off claims will affect only the measure of damages, and individual determinations of damages do not ordinarily preclude certification when liability can be established on a class-wide basis."); see also Allapattah Servs., Inc. v. Exxon Corp., 157 F.Supp.2d 1291, 1322 (S.D. Fla. 2001), aff'd, 333 F.3d 1248 (11th Cir. 2003), aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) ("In a class action, [a set-off defense] may be filed during the claims administration process solely to defeat or diminish the amount of a class member's recovery, but may not exceed the amount of the claim.").

As to the failure to mitigate damages, SeaWorld contends that it has a valid defense for failure to mitigate damages where class members reviewed their bank or credit card statements, yet failed to take any action to terminate their auto-renewed contracts for a matter of months or years. SeaWorld contends that the resolution of this defense will require individualized inquiry because there is no other method to determine whether class members reviewed their credit card or bank statements. However, courts generally treat the failure to mitigate defense in the same manner as other individ-

ualized damages issues. See In re Checking Account Overdraft Litig., 307 F.R.D. 630, 651 (S.D. Fla. 2015) ("Mitigation of damages, like the other damage-related affirmative defenses, is not barrier to class certification."); Terrill v. Electrolux Home Prod., Inc., 295 F.R.D. 671, 697 (S.D. Ga. 2013), vacated and remanded on other grounds in Brown v. Electrolux Home Prod., Inc., 817 F.3d 1225 (11th Cir. 2016) ("although Defendant's allegation that each purported class member failed to mitigate the member's own damages weighs against class certification, that issue does not preclude class certification where many other common issues exists and predominate the potentially individualized issue of mitigation of damages."); In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68, 86 (E.D.N.Y. 2000) ("However, the presence of individualized defenses, such as mitigation, going only to damages are generally regarded as no barrier to class certification.")

Furthermore, courts have also recognized that many "tools" exist to allow courts to effectively and efficiently deal with individualized damages issues that may arise in a class action. See In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) (tools include: "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."); see also In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100, 116 (S.D.N.Y. 2010) (finding that individualized mitigation defenses could be dealt with through the use of management tools if and when those issues arise).

In accordance with the above analysis, the Court finds that the issues discussed above under the commonality requirement, which arise from SeaWorld's common course of conduct taken pursuant to a form contract executed by all class members, predominate over any individualized issues such as the precise calculation of damages or resolution of affirmative defenses. Thus, the predominance requirement under Rule 23(b)(3) has been satisfied.

"The focus of the superiority analysis is on 'the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs.'" Palm Beach Golf Ctr., 311 F.R.D. at 699 (quoting Klay v. Humana, Inc., 382 F.3d 1241, 1269 (11th Cir. 2004)). In analyzing this requirement, courts often look at the size of the class, the similarity of the claims, and the size of the potential recovery for individual class members. See id. at 699 ("Given the large number of purported members in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources. Moreover, the relatively small potential recovery in individual actions ... and reduced likelihood that plaintiffs will bring suit also weighs in favor of class resolution."). SeaWorld argues that class-wide treatment of the claims is unmanageable, not superior. However, this argument is premised on SeaWorld's contentions that Plaintiffs failed to identify an ascertainable class and because common issues do not predominate. The Court has already addressed and rejected these contentions.

Here, the Court finds that the class mechanism is superior. The class potentially consists of over 120,000 individuals who have common claims against SeaWorld resulting from the alleged breach of a form contract. The recovery for many class members will be very small, consisting of only a few monthly "out of commitment" payments. The fact that many claims will be small in relation to the costs and expenses of litigating the claims makes it highly unlikely that the claims would be pursued individually. Although SeaWorld argues that individual claims under the EFTA may be tried separately just as efficiently because the statute provides for recovery of statutory damages, costs, and attorney's fees, the Court finds that splitting the breach of contract and EFTA claims of the subclass members would be inefficient and duplicative.

Therefore, the Court finds that Plaintiffs have satisfied the superiority requirement under Rule 23(b)(3).

## V. CONCLUSION

Because Plaintiffs have satisfied all of the requirements for certification of a class action under Rule 23, the Court finds that class certification is appropriate in this case. In accordance with the foregoing, it is hereby **ORDERED** that:

1. Plaintiffs' Motion to Strike Defendant's Expert Report of Allan Metcalf (Dkt. 91) is **GRANTED**;

2. Plaintiffs' Motion to Strike Defendant's Expert Report of Joseph J. Egan (Dkt. 92) is **DENIED**;

3. Plaintiffs' Motion for Class Certification (Dkt. 93) is **GRANTED**.

4. This action is certified as a class action, the **Breach of Contract Class** being comprised of:

 a. **All natural persons who purchased a one-year pass through Defendant's "EZ Pay" program to one of Defendant's theme parks located in the States of Florida, Texas, Virginia, and California;**

 b. **who were residents of the state where the park is located at the time of purchase;**

 c. **who purchased the pass within the applicable statute of limitations for the respective states;**

 d. **who paid for their one-year pass in less than 12 months; and**

 e. **who were charged any additional monthly payments for renewal of the pass after the one-year pass was paid in full.**

 and the **EFTA Subclass** being comprised of:

 a. **All natural persons who purchased a one-year pass through Defendant's "EZ Pay" program to one of Defendant's theme parks located in the States of Florida, Texas, Virginia, and California;**

 b. **who were residents of the state where the park is located at the time of purchase;**

 c. **who paid for their pass using a debit card;**

 d. **who paid for their one-year pass in less than 12 months;**

 e. **who were charged through an electronic fund transfer to their debit or bank account any additional monthly payments for renewal of the pass after the one-year pass was paid in full; and**

 f. **such additional monthly payments were charged on or after the date one year prior to the filing of this action.**

 Excluded from the Breach of Contract Class and the EFTA Subclass are:

 a. all persons who received full refunds from SeaWorld after being charged any monthly payments for renewal of the pass after the one year pass was paid in full;

 b. all persons who continued to use their EZ Pay pass after the one-year pass had expired;

 c. managers, directors and employees of SeaWorld and members of their immediate families;

 d. all agents of SeaWorld;

 e. legal counsel for Plaintiffs or Sea-World and members of their immediate families;

 f. all judges assigned to hear any aspect of this litigation, as well as their immediate family members; and

 g. any class members in the matter of Gargir v. SeaWorld Parks & Entertainment, Inc., No. 37–2015–00008175–CU–MC–CTL, in the California Superior Court, San Diego County (the Gargir Action), who have specifically released and discharged SeaWorld of any claims they may have in this case as a result of the class action settlement approved in the Gargir Action.

5. Plaintiffs Jason Herman, Joey Kratt, and Christina Lancaster are appointed as the class representatives for the Breach of Contract Class, and Plaintiff Joey Kratt is appointed as the class representative for the EFTA Subclass.

6. Attorneys Ryan C. Hasanbasic and Paul R. Fowkes of the Disparti Law Group, and James E. Felman and Katherine Earle Yanes of Kynes, Markman & Felman, P.A., are appointed as class counsel.

7. Plaintiffs shall file their proposed class notice within **fourteen (14) days** of this Order. SeaWorld shall file any objections to the proposed class notice within **fourteen (14) days** thereafter.

8. SeaWorld **SHALL** produce to Plaintiffs within **thirty (30) days** from the date of this Order the names, last known addresses, telephone numbers, email addresses, and Profile ID for all Breach of Contract class members. SeaWorld **SHALL** also produce a list of all EFTA Subclass members within the same timeframe. If SeaWorld is unable to do so, the Court **ORDERS** that SeaWorld's payment processing vendor, Freedom Pay, directly produce the list of EFTA Subclass members to Plaintiffs. The confidentiality that attends to this production may be addressed by the Parties via a confidentiality provision.

**DONE** and **ORDERED** in Tampa, Florida, this 10th day of March, 2017.